## Department of Revenue *vs.* C.M.J.

Franklin. April 6, 2000. - June 30, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Parent and Child,* Child support, Custody. *Practice, Civil,* Relief from judgment. *Words,* "Custodial parent."

A Probate Court judge erred in entering a child support order, in a proceeding concerning neither child custody nor child support, against a father who lived with his three children and their mother, who always had contributed to the household income, and who was a lawful corecipient of Transitional Aid to Families with Dependent Children that took into account the father's earnings, where the father could not be considered a noncustodial parent, where application of child support guidelines to an intact family was not appropriate, and where the order was not consistent with the public policy of advancing the best interests of the children inasmuch as it reduced the family's net income by twenty per cent. [75-81]

CIVIL ACTIONS commenced in the Franklin Division of the Probate and Family Court Department on April 14, 1997.

Complaints for contempt, filed on July 22, 1997, were heard by *Marie E. Lyons,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Oonagh C. Doherty* (*J. Paterson Rae* with her) for the defendant.

*John E. Bowman, Jr.,* Assistant Attorney General, for the plaintiff.

MARSHALL, C.J. This case concerns an order imposed by a Probate and Family Court judge on the defendant, a corecipient of Transitional Aid to Families with Dependent Children (TAFDC). The order requires the defendant to pay child support to the Department of Revenue (DOR), acting on behalf of the mother of the defendant's children, A.M.R., and the Department

of Transitional Assistance (DTA).[1] On appeal the parties both agree on the result sought — the vacating of the child support order. The appeal consequently places both parties in the unusual posture of standing together on the same side of the argument, both ranked against the judicial order and the rationale behind it.

A.M.R., the defendant, and their three children receive TAFDC benefits.[2] Under State law child support payments from a parent (typically absent[3]) are paid to the DTA as partial reimbursement for the TAFDC benefits paid to assist his or her

---

[1] In that same initial April 2, 1998, order, the judge had also required the defendant to resign from the program, but vacated that provision in an amended order of November 20, 1998. The amended order resulted from the Department of Revenue's (DOR's) September 21, 1998, motion for relief from judgment, seeking to vacate the judge's April 2 order in its entirety. A hearing on the motion took place on November 17, 1998. The amended order left standing the provisions ordering child support. The judge let the child support provisions stand even though the defendant was again unemployed at the time of the November 17, 1998, hearing. In contrast, as the DOR notes, the court did not order support payments at the time of the original 1997 paternity judgment because it recognized the defendant was unemployed at that time.

[2] Transitional Aid to Families with Dependent Children (TAFDC), administered by the Department of Transitional Assistance (DTA), is the successor program to Aid to Families with Dependent Children (AFDC). *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 640 (2000). See St. 1995, c. 5, § 110 (*a*); G. L. c. 118, §§ 1, 2. "The purpose of the program, generally, is to enable children to continue living at home through the provision of funds for their shelter, food, and other necessities, where one or both parents is unable fully to provide support or absent." *Smith* v. *Commissioner of Transitional Assistance*, supra. See *Salaam* v. *Commissioner of Transitional Assistance*, 43 Mass. App. Ct. 38, 39 (1997), quoting *Civetti* v. *Commissioner of Pub. Welfare*, 392 Mass. 474, 477 (1984).

TAFDC has provisions designed to facilitate the Commonwealth's child support enforcement program. See, e.g., 106 Code Mass. Regs. §§ 203.000(K), 203.700 (1998). Certain aspects of that enforcement program are meant to comply with Federal provisions of Title IV, Part D, of the Social Security Act (Title IV-D), 42 U.S.C. §§ 651 et seq. (1994). See, e.g., G. L. c. 119A, § 1; 830 Code Mass. Regs. § 18.18A.1(2) (1997). The DOR provides "IV-D services," including the establishment of paternity and the establishment and enforcement of child support orders for recipients of public assistance, in accordance with Title IV-D. See G. L. c. 119A, § 2. See also G. L. c. 119A, § 1 (designating DOR as IV-D agency pursuant to Title IV-D); *id.* at § 1A (explaining IV-D services); C.P. Kindregan, Jr. & M.L. Inker, Family Law and Practice §§ 39.3, 39.4 (1996) (discussing Federal mandate for child support enforcement and Massachusetts enforcement program).

[3] As the United States Senate noted, in a report concerning the enactment of

children. See G. L. c. 119A, § 12 (*b*). See also 42 U.S.C. § 657(b)(2) (1994). What makes this case unusual, and what has provoked this appeal, is that the defendant is not an absent father, but rather lives with and has always supported his children. Consequently, the judge's order for child support, paid out of the household income to the DTA, has the effect of reducing dramatically the income of the household where the children live. It is a child support order that effectively reduces support for the children who ostensibly were to benefit from it.[4]

The defendant appealed from both the initial April, 1998, order and the amended order of November, 1998, based on a motion for relief from judgment pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974),[5] and, as noted, the DOR is also arguing against the orders. The appeals were consolidated. We transferred the case on our own motion. We agree with the defendant and the DOR and vacate the judge's April 2, 1998, order as amended.

1. *Background.* The defendant and A.M.R. have lived together since 1990, except for a short period in 1996. They live with their three children, three through five years old at the time of the April, 1998, order. The uncontested evidence is that the

Title IV-D, "[t]he problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their *absent* parents. Of the 11 million [AFDC] recipients . . . 4 out of every 5 are on the rolls because they have been deprived of the support of a parent who has absented himself from the home." (Emphasis added.) S. Rep. No. 93-1356 (1974), reprinted in 1974 U.S.C.C.A.N. 8133, 8145. See note 2, *supra.* Other sections of this Senate report make clear that the Federal concern with enforcing child support for AFDC recipients was focused on collecting support from absent or deserting parents. See *id.* at 8145-8148, 8150-8155, 8158.

[4]The DOR noted in its September 21, 1998, motion for relief from judgment that the "DTA does not increase the family's TAFDC grant to reflect the loss of income resulting from the amount deducted from [the defendant's] earnings for child support . . . . Furthermore, the Commonwealth retains the child support as reimbursement for the TAFDC benefits . . . . As a result, the [defendant's] family has become further impoverished." One DTA administrator stated that the family would lose $349 per month due to the child support order, although, apparently, pursuant to departmental regulations, $50 of that amount would actually be remitted to A.M.R., meaning a net loss to the family of $299 per month due to the order. See 42 U.S.C. § 657(b)(1), (2) (1994). See also 106 Code Mass. Regs. §§ 204.220(A), 204.230, 204.250(GG) (1996) (up to first $50 in current child support for children in assistance unit not counted in calculation of TAFDC grant amount and for other purposes).

[5]Pursuant to a joint motion for a stay filed by both the plaintiff and defendant, the parties obtained on May 21, 1998, a stay of the relevant portions of the April 2 order pending its appeal.

defendant has always contributed to his children's support. The defendant has medical problems connected to a knee condition and is frequently unemployed or underemployed. In April, 1998, he earned only $282.76 and his household was eligible for TAFDC benefits because its total income did not exceed TAFDC eligibility levels.[6] There is no evidence that the defendant has not availed himself of every opportunity to work.

The Probate Court proceedings concerning the defendant began April 14, 1997, when the DOR, as the subrogee of the DTA,[7] sought to establish officially the paternity of his three children.[8] There was no claim that the defendant had ever denied paternity of his three children; they bore the defendant's surname. As the DOR acknowledged before this court, it had reason to establish the defendant's paternity, so that in the event he ever left his family, the DOR would be in a position to seek child support from him. See 42 U.S.C. § 654(4)(A) (1994)

[6]The DTA deals with TAFDC recipients as members of an "assistance unit," the group of persons who are eligible for TAFDC benefits whose needs are considered together in determining TAFDC eligibility and the amount of the TAFDC grant. 106 Code Mass. Regs. § 204.300 (1997). The assistance unit is in many cases synonymous with a family or household, but need not always be. See *id.* In this case, the terms "family," "household," and "assistance unit" are functional equivalents. Pursuant to departmental regulations, the assistance unit must include "the natural and/or adoptive parent(s) of the dependent child living in the same household as the dependent child." *Id.* at § 204.305(A).

The statute and regulations governing TAFDC allow recipients to make a certain amount of earned income, with TAFDC benefits being lowered accordingly under regulatory formulae. See St. 1995, c. 5, § 110 (*d*), (*g*); 106 Code Mass. Regs. §§ 203.550(B), 204.280, 204.285 (1997). A DTA assistant director stated in an affidavit that, although the defendant had earned income in April, 1998, "he was part of [A.M.R.'s] assistance unit because his income did not exceed TAFDC eligibility levels for a family of five."

[7]TAFDC recipients subrogate to the DTA the right to collect child support payments owed them; the DOR, in turn, acts to collect for the DTA. See G. L. c. 18, § 21; *Brady v. Brady*, 380 Mass. 480, 483-486 (1980) (discussing this subrogation). See also G. L. c. 119A, §§ 2, 3 (DOR empowered to enforce subrogation rights of DTA); 42 U.S.C. §§ 654(5), 657 (generally requiring child support payments for AFDC recipients to be made to the State).

[8]Although there was nothing to suggest that the defendant had not supported his children to the fullest extent he could on his meager income, in the initial April, 1997, standard complaint form the DOR also requested that the court order the defendant to pay a "suitable" amount of child support and maintain or provide health insurance for the children, order the defendant to reimburse the DTA for past support provided to the children, and order such other relief as the court deemed appropriate.

(requiring State plan for child support enforcement to provide services relating to establishment of paternity). After a hearing on May 21, 1997, the judge adjudicated the defendant the father of the children, and ordered him to notify the DOR and file a financial statement on securing employment and to report to the family service office (FSO) of the Probate Court with fifteen verified job applications per week. The order did not adjudicate custody of the children, who were living with both parents. The judge's May 21, 1997, order, docketed June 10, 1997, also stated that the issue of child support may be "marked up" by motion by any interested party.

On July 22, 1997, the FSO filed a civil contempt complaint against the defendant for violation of the May 21 order because he had not reported fifteen job applications every week. The contempt complaint did not assert that any child support order had been violated and did not seek entry of child support orders. In September, 1997, the defendant found employment. On April 1, 1998, A.M.R. reported to the Probate Court that the household was receiving $741 per month in TAFDC benefits, "depending on wages"; the defendant reported gross earnings of $260 per week from his job at that time.[9]

On April 1, 1998, the judge conducted a brief hearing (the entire transcript is two and one-half pages long) concerning the contempt complaint, at which an attorney for the DOR, a representative of the FSO, A.M.R., pro se, and the defendant, pro se, were present. The judge and the DOR attorney had a brief exchange, in which the DOR attorney informed the judge that they were before the court solely due to the failure of the defendant to report to the FSO. When the judge suggested that the defendant would owe $80.60 under the child support guidelines, the DOR attorney responded that the defendant was part of the household and the DOR could not ask for child support because he was in the TAFDC grant. Before any questioning of either A.M.R. or the defendant, and without providing any opportunity for the defendant to speak on his own behalf, the judge ordered the defendant as follows: "You're to resign from the AFDC grant, sir, today and you're going to pay child support to the Department of Revenue on behalf of these children. . . . [Y]ou're no longer a part of that group, [so] file

---

[9]The judge apparently found that until April 1, 1998, the defendant did not notify the DOR that he had found employment in September, 1997, nor did he file a financial statement with the court, despite the order to do both.

your discharge from that today. I'm going to establish [a child support] order of $80.60 a week and that's to be paid to the Department of Revenue. That will be by wage assignment . . . ."[10] The judge issued a written order to this effect that day, docketed on April 2, 1998. The judge did not make any ruling on the contempt complaint. According to the DOR, "[t]he court did not enter any order on the contempt complaints for failure to report job applications, having learned from the DOR attorney and the financial statement that [the defendant] was employed."

Later, on September 22, 1998, the judge entered "findings of fact and conclusions of law." The judge "found" that the defendant and A.M.R. had a combined monthly income of approximately $1,781,[11] and "found" that their monthly expenses were $1,060. She concluded that the defendant, although living with his children in the household, was not a "custodial" parent, and thus could be ordered to pay child support.[12] As part of her rationale for the judgment the judge stated that the household had "excess earnings," which "should be utilized, in the form of a child support order, to reimburse the coffers of the Department of Transitional Assistance."[13] The judge reasoned that it was "against public policy for the Court to exempt a non-custodial parent, who has been adjudicated the father of

---

[10]After the judge's order to the defendant to pay child support and following an exchange with the FSO representative about the defendant paying the sheriff's fees for service of the complaint, the judge asked, "Anything else?" The FSO representative responded, "No, your Honor." The judge then adjourned the proceedings. We do not construe this query as a timely invitation by the judge to the defendant to present his side of the case.

[11]This figure is apparently gross income. The $1,781 in gross monthly income found by the judge appears to be based on some unspecified assumption that the family was making $741 in TAFDC benefits per month *at the same time* it was receiving gross weekly earned income from the defendant of $260 a week or $1,040 a month. As the DTA assistant director's affidavit, submitted to the court prior to the judge's amended order of November 20, 1998, makes clear, however, a TAFDC benefit level for a family of five of $741 is for *unemployed* recipients. When the defendant earned wages, that benefit level was reduced. As the judge herself found, the family's TAFDC benefits varied monthly depending on the defendant's wages. Thus, the $1,781 gross income figure is not supported by the record and seems implausible, because it does not appear that the family would have been receiving $741 in TAFDC benefits while the defendant was earning $1,040 a month.

[12]See Part 2a, *infra.*

[13]The judge also gave, as part of the rationale for her order, that the defendant had not reported to the FSO with job applications, had not informed

minor children and is a wage earner, from paying child support solely because he has the same address as his children and their mother," and that the level of child support was appropriately set at the amount indicated by the application of the child support guidelines. The judge reasoned that the child support order was "in-line with the public policy expressed by G. L. c. 119A, § 1, that children shall be maintained from the resources of their parents, thereby relieving the burden borne by the citizens of the Commonwealth."

There is evidence that dire financial consequences followed the order and the consequent garnishing of the defendant's paycheck. A.M.R., the defendant, and their three young children were unable to pay their rent and were in danger of being evicted. Their gas and electricity were maintained only by borrowing funds from A.M.R.'s grandmother. They were unable to purchase sufficient food for the household. Insurance for their car[14] — needed to bring their daughter to medical appointments and to get the defendant to work when his knee is troubling him — was to be cancelled for nonpayment. Both A.M.R. and the defendant stated that their children were suffering due to the garnishing of C.M.J.'s wages under the child support order.

2. *Discussion.* We review child support orders, and decisions on motions for relief from judgment pursuant to rule 60 (b), to determine if there has been a judicial abuse of discretion. See *Department of Revenue* v. *G.W.A.*, 412 Mass. 435, 441 (1992); *Kalenderian* v. *Marden*, 46 Mass. App. Ct. 930, 931 (1999);

the DOR that he was employed, and did not file a completed financial statement with the Probate and Family Court upon securing employment.

There was no evidence that the defendant or A.M.R. had not reported the defendant's earnings to the DTA once he became employed. Nor does the judge state or imply that any attempt to defraud the DTA was at issue, in terms of improper eligibility for or improper amounts received of TAFDC assistance, in any delayed reporting by the defendant of his employment to the court and another agency (the DOR). To the contrary, the judge found that the "exact amount of TAFDC benefits varied from month to month depending on [the defendant's] wages," suggesting that the household was reporting the defendant's wages to the DTA and their TAFDC benefits were being lowered accordingly in the months prior to the April 1, 1998, contempt hearing. Moreover, the DOR asserted, in its September 21, 1998, motion for relief from judgment, that the "DTA was aware that [the defendant] was working and included him in the budget. The AFDC budget was reduced to account for [the defendant's] income."

[14]DTA regulations allow TAFDC recipient families to own a car. See 106 Code Mass. Regs. § 204.120(G).

*Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. 426, 429, 433, 435 (1979). We find merit in many of the arguments advanced by the defendant and the DOR for relief from the child support order and examine in detail only two we consider most significant.[15]

a. *Noncustodial parent.* The judge premised the child support order on the defendant's being a "noncustodial" parent, a conclusion he challenges. The judge held that pursuant to G. L. c. 209C, § 10 (*b*), the mother shall have custody of a child born out of wedlock, and this custody continues in the absence of an order or judgment of the Probate Court relative to custody. Because there had been no order from the Probate Court awarding the defendant legal or physical custody of his children, nor any petition by him for custody, the judge concluded that the defendant was not a custodial parent and was responsible for paying child support. See *id.* The judge's child support order is thus premised on an interpretation of G. L. c. 209C, § 10 (*b*), that would presume that, "[i]n the absence of an order or judgment of a probate and family court relative to custody, the mother shall continue to have custody of a child after an adjudication of paternity," whereas the father so adjudicated would not be presumed to have or share custody, that is, would be "noncustodial," even though he lived with and supported his children. This is an erroneous interpretation of the law.

The resolution of custody questions "necessarily begins with the premise that parents have a natural right to the custody of their children." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 587 (1981). See *Secretary of the Commonwealth* v. *City Clerk of Lowell*, 373 Mass. 178, 185 (1977) ("Parents' claim to authority in their own household to direct the rearing of their children is basic to the structure of society; the custody, care and nurture of the

---

[15]The defendant claims that the judge violated the due process guarantees of the United States and Massachusetts Constitutions. Due process concerns are raised when the parties have not been given notice that will apprise them of the matters the judge will adjudicate. See, e.g., *Mullein* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Care & Protection of Manuel*, 428 Mass. 527, 535 (1998). The defendant claims that the failure of the judge to provide the defendant with an opportunity to be heard before ruling also raises potential due process concerns. See, e.g., *Massand* v. *Medical Professional Mut. Ins. Co.*, 420 Mass. 690, 694 (1995), citing *Goldberg* v. *Kelly*, 397 U.S. 254, 267 (1970). We do not reach the constitutional claim. See *American Motorcyclist Ass'n* v. *Park Comm'n of Brockton*, 412 Mass. 753, 758 (1992).

child reside first in the parents"). See also *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 3 (1979) (right to raise one's children is basic civil right; interests of parents in their relationship with their children are fundamental and constitutionally protected). Consequently, absent an adjudication of custody to the contrary, a parent, such as the defendant, living in the home with his minor children and supporting those children, is a custodial parent. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra.*

The statutory provision the judge cites, G. L. c. 209C, § 10 (*b*), does not change this conclusion for the following reasons. General Laws c. 209C, § 10 (*b*), states: "Prior to or in the absence of an adjudication or voluntary acknowledgment of paternity, the mother shall have custody of a child born out of wedlock. In the absence of an order or judgment of a probate and family court relative to custody, the mother shall continue to have custody of a child after an adjudication of paternity or voluntary acknowledgment of parentage." Notably, the statutory provision does not state that an adjudicated father shall *not* have custody in the absence of such an order or judgment, nor does it employ the term "noncustodial" or apply this term to the father. See *id.*

To interpret the statute as the judge did, so as to presume that the mother, but not the father, shall have custody in such circumstances, would raise potential constitutional problems. See art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution. "[O]ur duty [is] to construe a statute in a way to avoid constitutional problems" if reasonable principles of interpretation permit. *Lambert* v. *Executive Director of the Judicial Nominating Council*, 425 Mass. 406, 410 (1997). Consequently, we cannot construe this statutory provision to mean that a mother in such circumstances is a custodial parent, but a father is not.

We also agree with the defendant that the judge's interpretation runs counter to other Massachusetts and Federal statutes concerning child support enforcement and custody. See, e.g., 42 U.S.C. § 669b(a) (1994) (regarding grants to programs to support "noncustodial parents' access to and visitation of their children"); G. L. c. 62D, § 10A (commissioner authorized to enter into reciprocal agreements with other States to share lists of *absent* parents who owe support payments). Cf. G. L. c. 209C, § 9 (court may order support for child *aged eighteen*

*to twenty-one* who is domiciled in home of parent and dependent on that parent). Chapter 209C does not provide a definition of custody, but G. L. c. 208, § 31, does.[16] Section 31 provides that "sole legal custody" means that "one parent shall have the right and responsibility to make major decisions regarding the child's welfare including matters of education, medical care and emotional, moral and religious development," and similarly, "sole physical custody" means that "a child shall reside with and be under the supervision of one parent, subject to reasonable visitation by the other parent." These definitions of sole custody do not square readily with the circumstances here, where the defendant (father), and not solely A.M.R. (mother), has "the right and responsibility to make major decisions" regarding the children's welfare, and where the children "reside with and [are] under the supervision" of both. G. L. c. 208, § 31. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 587 (1981). In addition, our courts have regularly applied the term "noncustodial" parent in circumstances where such a parent did not live with the other parent and the children, but rather had visitation with the children in many cases. See, e.g., *Rosenberg* v. *Merida*, 428 Mass. 182, 182-184 (1998) (parents separated; "noncustodial" father, living in Texas, granted visitation); *Edward E.* v. *Department of Social Servs.*, 42 Mass. App. Ct. 478, 479, 486 (1997) ("noncustodial" parent had supervised visits, visitation rights); *Leonardo* v. *Leonardo*, 40 Mass. App. Ct. 572, 573, 576 (1996) ("noncustodial" parent had schedule to visit children); *Canning* v. *Juskalian*, 33 Mass. App. Ct. 202, 202-203, 209 (1992) ("noncustodial" father resides in Massachusetts; mother's household is in California with child). Similarly, and significantly, we have said that the subrogation provision of G. L. c. 18, § 21, concern-

---

[16]One relevant regulatory definition of "noncustodial parent" would lead to circular reasoning in this case and is not helpful. It defines a noncustodial parent as "an individual . . . who owes or may owe a duty of support, or who is liable under a child support obligation, or who is alleged . . . to be the parent of a child to whom a duty of support is owed." 830 Code Mass. Regs. § 18.18A.1. Because parents ordinarily owe a duty of support for their minor children, see, e.g., G. L. c. 273, § 8, this regulatory definition of noncustodial parent, read too literally, might appear to apply to any parent — an unsupportable result. Nor would we find it supportable for a judge to use this regulatory definition to transform a parent living with and supporting his children into a "noncustodial parent" through the simple bootstrapping technique of issuing a child support order to create "liab[ility] under a child support obligation."

ing the right of the DTA to collect support payments owed to a welfare recipient, "protects the public from the burden of assuming the support obligations of an *absent* spouse who is able to pay" (emphasis added). *Brady* v. *Brady*, 380 Mass. 480, 485 (1980).

We also agree with the defendant that one practical outcome of letting the judge's flawed interpretation stand, presuming sole maternal custody and labeling the father "noncustodial" in such cases, would be that unmarried, cooperative, cohabiting fathers would need to seek custody determinations from the Probate Court to protect themselves — and, in cases such as this, their children — from child support orders. The judge's interpretation would therefore spur adjudication in a context in which parents have, thus far, understood that no adjudication was necessary — a result contrary to our interests in minimizing State interference in the protected zone of the family.

The judge cited G. L. c. 119A, § 13 (*c*), and c. 209C, § 9 (*c*), for the proposition that "[i]n any proceeding to establish or modify an amount of child support, the child support guidelines . . . shall apply." She further observed that, if the court finds that a parent is chargeable with the support of a child, the court must order the parent to pay toward that support, citing G. L. c. 209C, § 9 (*a*).

The judge's implicit characterization of this as a proceeding to establish or modify child support was incorrect. The contempt complaint did not raise this issue, nor did the FSO or DOR at the hearing. To the contrary, at the hearing the DOR told the judge that they could not ask for child support in this case because the defendant was in the household receiving the TAFDC grant. For similar reasons, the judge's invocation of the child support guidelines seems inappropriate in such a case. The guidelines state that "[t]here shall be a presumption that these guidelines apply . . . in all cases *seeking the establishment or modification of a child support order*" (emphasis added), Massachusetts Child Support Guidelines, issued by the Chief Administrative Justice of the Trial Court, something that was not taking place here.

Moreover, the child support guidelines cited by the judge contain language that should have cautioned the judge against their application, and against the issuance of a child support order, in such a case. The guidelines expressly refer to the "principles" of "meet[ing] the child's survival needs in the first instance" and of "protect[ing] a subsistence level of income of

parents at the low end of the income range whether or not they are on public assistance." In addition, it is clear that the guidelines are intended to advance the best interests of the child, and that the guidelines may be departed from where they do not serve those best interests. See G. L. c. 209C, §§ 9 (*c*), 20. Given the predictable impact of the child support order here, of reducing the family's income in direct contravention of these principles, invocation of the guidelines to support the order was inappropriate.

The guidelines also seem clearly intended for situations where the family has broken up or is on the verge of doing so, not those in which the family is intact and the father is directly supporting his children. They state, for example, as principles, "[t]o minimize the economic impact on the child *of family breakup*" and "to provide the standard of living the child would have enjoyed *had the family been intact*" (emphasis added). The guidelines "are based upon traditional custody and visitation arrangements," and are not applicable where "the parties agree to shared physical custody," the court establishes shared physical custody, or where there is split physical custody. Guideline § II(D)(1). All this language argues against the application of the guidelines, and, indirectly, against the ordering of parental child support generally, against a parent within an intact family, where the parents are both sharing a household and together raising and supporting the children who are the subject of the support order.[17]

b. *Best interests of the children.* The DOR makes the additional argument that the child support order offended public policy and was not consistent with our Commonwealth's policy of advancing the best interests of the children, particularly in the entering of child support orders. See G. L. c. 209C, § 9 (*c*). See also *id.* at § 20 (child support judgments may be modified only if modification is in child's best interests); G. L. c. 119A, § 1 (Commonwealth's policy is to direct its efforts to strengthening family life for protection and care of children and to assist use by any family of all available resources to this end); *id.*

---

[17]Payments in support of the children from agencies, absent parents, or others with a duty of support, may of course still be appropriate even if the children are in a reconstituted or otherwise intact family. An obligation for child support owed by a noncustodial parent does not automatically become void if the noncustodial parent returns to the household, assumes custody of the child, or resumes cohabitation with the custodial parent. Cf. 830 Code Mass. Regs. § 119A.6.1(5)(c).

at § 3 (when department seeks to enforce payment of arrearage for child support, it shall not seek an order that would indirectly result in decrease in amount of current support paid on behalf of child or spouse support is owed to). We agree that a child support order that further impoverishes the household of the children the order was meant to support cannot be in the best interests of those children.

There was no evidence or argument presented that the defendant was circumventing DTA regulations, or obtaining TAFDC improperly or in excess of an amount properly payable to an assistance unit with an underemployed parent. See note 13, *supra.* The Probate Court judge seemed to ignore the fact that the household's already modest TAFDC benefits — a maximum of $741 per month for a family of five — were already being reduced because of the defendant's earnings. Neither equity, public policy, nor statutory provisions required, in effect, a further reduction in the net TAFDC benefits by a child support order that reimbursed the DTA nearly twenty per cent of the family's already low income.

For all the foregoing reasons, we conclude that the judge abused her discretion in ordering child support. We vacate the order entered April 2, 1998, as amended. We remand this matter for entry of an order dismissing the civil contempt complaints.

*So ordered.*