# United States Court of Appeals
## For the First Circuit

No. 07-2311

RUBEN JORGE MONTEIRO PINA,

Petitioner,

v.

MICHAEL B. MUKASEY, United States Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Selya, and Dyk[*], Circuit Judges.

Lawrence Gatei for petitioner.
Corey L. Farrell, with whom Gregory G. Katsas, Acting
Assistant Attorney General, was on brief, for respondent.

September 12, 2008

[*]Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge**.    The Department of Homeland Security ("DHS") charged petitioner Ruben Jorge Monteiro Pina ("Pina") with removability pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien convicted of an aggravated felony after admission.  The Immigration Judge ("IJ") determined that Pina had automatically acquired United States citizenship under the Child Citizenship Act of 2000 ("CCA"), 8 U.S.C. § 1431, and ordered the removal proceedings terminated.  The Board of Immigration Appeals ("BIA") determined that Pina was not a U.S. citizen because the requirements of the CCA had not been satisfied, and vacated and remanded for further proceedings.  The IJ issued an order of removal.  This court granted a stay of removal pending review.  Because we disagree with the decision of the BIA on the issue of legal custody, we vacate the removal order and remand for further proceedings.

**I.**

Pina was born in the Republic of Cape Verde on November 11, 1983.  His parents have never married each other, and he initially lived with his mother in Cape Verde.  However, Pina's father signed his birth certificate in 1988, thereby legitimating him under the Civil Code of Cape Verde.  In 1985, Pina's father moved to the United States.  After moving to the United States, he supported Pina financially, had regular contact with him, and visited him in Cape Verde once a year.

In November 1994, eleven-year-old Pina and his mother also moved to the United States and were admitted as lawful permanent residents. Initially, they lived in Everett, Massachusetts, a town about thirty minutes' drive from Dorchester, Massachusetts, where Pina's father resided. Approximately one year later, Pina and his mother moved to Dorchester at his father's suggestion. The IJ found that, during this time, Pina's mother and father had, by informal agreement, "an arrangement similar to that of shared legal custody" and "akin to 'shared physical custody'" under Massachusetts law. A.R. at 69. Pina had daily contact with his father, frequently eating meals with him and occasionally spending the night at his house. Pina's father also continued to support him financially, and was involved in decisions regarding major aspects of Pina's life, including his education. Pina's mother informed his father of any disciplinary issues at school or with law enforcement; Pina's father would then talk to his son about proper behavior.

Pina's father became a citizen in 1996, when Pina was thirteen years old. The same relationship continued after Pina's father acquired citizenship and continued through Pina's eighteenth birthday; the record does not disclose Pina's relationship with his father after Pina turned eighteen.

On November 20, 2002, Pina was convicted in Massachusetts state court of receiving a stolen vehicle in violation of Mass.

Gen. Laws chapter 266, section 28. He was sentenced to a term of imprisonment of two years. On March 12, 2007, DHS served Pina with a notice to appear in Immigration Court and charged him with removability under 8 U.S.C. § 1227(a)(2)(A)(iii), which provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." A theft offense, including receipt of stolen property, is defined as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) if it carries a term of imprisonment of at least one year.

On April 4, 2007, Pina, through counsel, moved to terminate the removal proceedings, claiming derivative citizenship through his father under the CCA. The CCA provides:

> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
>
> (2) The child is under the age of eighteen years.
>
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a). The IJ held a hearing on April 11, 2007. The parties agreed that Pina satisfied the first two requirements for derivative citizenship under the CCA, because Pina had at least one parent who was a United States citizen and because he was under age

-4-

eighteen when the CCA took effect. See 8 C.F.R. § 320.2(a) ("To be eligible for citizenship under [the CCA], a person must establish that the [statutory] conditions have been met after February 26, 2001.").

The sole question was thus whether Pina's father had "legal and physical custody" when the act became effective. At the hearing, Pina and both of his parents testified as to his relationship with his father. The IJ granted Pina's motion to terminate the following day, and issued a written decision on April 26, 2007. After reviewing the testimonial evidence, the IJ determined that Pina's father had both legal and physical custody of Pina at the time the CCA went into effect in February 2001. Accordingly, the IJ held that Pina had established that he automatically acquired U.S. citizenship pursuant to the CCA. The IJ then terminated the removal proceedings and ordered that Pina be released from DHS custody.

The government appealed the decision of the IJ to the BIA. On July 23, 2007, the BIA sustained the appeal and vacated the IJ's decision, finding that the requirements of derivative citizenship under the CCA were not met because Pina's father did not have "legal custody" of him. The BIA interpreted Massachusetts law to require a court order or judgment of custody before the father of a child born out of wedlock will be deemed to have legal custody of the child. Pina's parents did not have a formal court

order related to his custody. The BIA determined that Pina's father also could not establish legal custody under 8 C.F.R. § 320.1(2), which allows a finding of legal custody when the U.S. citizen parent has been "awarded 'joint custody'" or when "other factual circumstances" support such a finding. The BIA did not explain the basis of its conclusion that no such "other factual circumstances" existed here. The BIA did not reach the question of whether Pina's father had physical custody. The BIA remanded the case to the IJ for further proceedings.

On September 12, 2007, the IJ issued an order directing that Pina be removed to Cape Verde. Pina timely petitioned for review in this court. On November 14, 2007, the court granted Pina's motion to stay removal pending the outcome of his petition for review. Although the removal order is stayed, Pina remains in DHS custody. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1) and 8 U.S.C. § 1252(b)(5), to review questions of law.

## II.

The government agrees that the facts of this case are not in dispute and that Pina satisfies the first two requirements for automatic citizenship under the CCA. Pina's father is a citizen of the United States by naturalization, and Pina was seventeen years old and living in the United States in February 2001, when the CCA became effective. The question on review is whether Pina's father

had "legal custody" of him at that time.[1] That issue is a question of law which we review with "deference to the BIA's interpretation of the immigration statutes it is charged with enforcing." Gonzalez-Mesias v. Mukasey, 529 F.3d 62, 64 (1st Cir. 2008); see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984).

The current version of § 1431(a) was enacted in 2000 and became effective on February 26, 2001. See Pub. L. No. 106-395, 114 Stat. 1631. Its purpose was to liberalize then-existing law to make it easier for foreign-born children of United States citizens to obtain citizenship. See H.R. Rep. No. 106-852, at 4 (2000), reprinted in 2000 U.S.C.C.A.N. 1499, 1501. Prior to 2000, the relevant statute provided:

> A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:
>
> (1) The naturalization of both parents; or
>
> (2) The naturalization of the surviving parent if one of the parents is deceased; or
>
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of

---

[1] Under the CCA, a child obtains automatic citizenship if, at any time between the relevant parent's naturalization and the child's eighteenth birthday, the statutory requirements are met.

-7-

> the child has not been established by legitimation; and if
>
> > (4) Such naturalization takes place while such child is under the age of eighteen years; and
> >
> > (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (1994) (emphases added).

Because Pina's paternity had been established by legitimation, under the pre-2000 statute Pina could have obtained automatic citizenship only through the naturalization of both parents. Pina's mother was never naturalized.

The new version of the statute requires only one naturalized parent, so long as that parent has legal and physical custody of the child. See 8 U.S.C. § 1431(a). The CCA not only liberalized the requirements for automatic citizenship in general, it also equalized the position of mothers and fathers with regard to the citizenship of children born out of wedlock. Under the previous statute, a child born out of wedlock could gain automatic citizenship only if both parents became naturalized, or if the mother did (when the child had not been legitimated); such a child can now gain citizenship if either the mother or father becomes naturalized and has legal and physical custody.

-8-

This court has established that, because "[l]egal relationships between parents and children are typically governed by state law," the term "legal custody" as used in federal immigration law "should be taken presumptively to mean legal custody under the law of the state in question." Fierro v. Reno, 217 F.3d 1, 4 (1st Cir. 2000) (applying former § 1432, precursor to current § 1431, and holding that legal custody could not be established for automatic citizenship purposes by later nunc pro tunc order). Accordingly, absent a contrary provision in the statute or its regulations, state law will govern the interpretation of "legal custody."

Nothing in the CCA itself defines the term, and the legislative history is unilluminating. A regulation promulgated by the Immigration and Naturalization Service ("INS"), formerly the agency responsible for the administration of immigration services, pursuant to the CCA defines "legal custody" as "the responsibility for and authority over a child." 8 C.F.R. § 320.1. This definition is in accord with the traditional understanding of the term. See Black's Law Dictionary 413 (8th ed. 2004) (defining "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare"). Although the Massachusetts statute dealing with children born out of wedlock does not contain a definition of legal custody, the statute pertaining to divorce

defines it in accordance with the general definition and the regulation: the right and responsibility to make "major decisions regarding the child's welfare including matters of education, medical care and emotional, moral and religious development." Mass. Gen. Laws ch. 208, § 31 (2007) (defining "sole legal custody" and "shared legal custody" for purposes of custody orders).

The government agrees that Pina's father in fact exercised the rights traditionally associated with legal custody. As the IJ determined, Pina's parents had an informal agreement under which they exercised what amounted to shared legal and physical custody as defined by Massachusetts law. However, the government argues that, even though neither the traditional definition of legal custody, nor the CCA, nor the INS regulations require a court order, Massachusetts law imposes the additional requirement of a court order. It contends that, under Massachusetts law, the father of a child born out of wedlock cannot have "legal custody" of that child absent a court decree awarding such custody, and that a parental agreement cannot confer legal custody without the approval of a court. The government relies primarily on section 10(b) of chapter 209C of the Massachusetts General Laws, which provides:

> Prior to or in the absence of an adjudication or voluntary acknowledgment of paternity, the mother shall have custody of a child born out of wedlock. <u>In the absence of an order or judgment of a probate and family court relative to custody, the mother shall continue</u>

-10-

to have custody of a child after an adjudication of paternity or voluntary acknowledgment of parentage.

Mass. Gen. Laws ch. 209C, § 10(b) (emphasis added). The government interprets section 10(b) to mean that, in the absence of a court order, the mother of a child born out of wedlock shall have sole legal custody, even where paternity has been established.

In our view, the government has not accurately interpreted Massachusetts law. In Dep't of Revenue v. C.M.J., 731 N.E.2d 501 (Mass. 2000), the Supreme Judicial Court held that the legitimated father of a child born out of wedlock may be considered a "custodial" parent in the absence of a court order of custody. C.M.J. involved a father of three children born out of wedlock who resided with the children and their mother; both parents and the children were corecipients of Transitional Aid to Families with Dependent Children ("TAFDC") benefits. A Probate and Family Court judge nonetheless ordered the father to pay child support to the Department of Revenue.[2] The trial judge, relying on section 10(b), found that the father was a noncustodial parent obligated to make child support payments because "there had been no order from the Probate Court awarding the defendant legal or physical custody of his children." Id. at 507.

---

[2] Under state law, child support payments are paid to the Department of Revenue as partial reimbursement for the TAFDC benefits.

-11-

The Supreme Judicial Court vacated the child support order. The court found that the family court judge's reading of section 10(b) was "an erroneous interpretation of the law." Id. The court noted that section 10(b) "does not state that an adjudicated father shall <u>not</u> have custody in the absence of . . . an order or judgment, nor does it employ the term 'noncustodial' or apply this term to the father." Id. at 507-08. Indeed, the court noted that to interpret the statute that way--as the government here urges--would "raise potential constitutional problems" in light of article 1 of the Massachusetts Declaration of Rights, as amended by article 106 of the Amendments to the Massachusetts Constitution, <u>id.</u> at 508, which guarantees that "[e]quality under the law shall not be denied or abridged because of sex," Mass. Const. pt. 1, art. 1.[3] The court explained that, because both parents were exercising the rights associated with both physical and legal custody, under the statute the father was also a custodial parent. See <u>C.M.J.</u> at 508. Despite the fact that there was no court decree awarding shared custody to the father, the

---

[3] As the Supreme Judicial Court recognized, article 1 of the Massachusetts Declaration of Rights, as amended by article 106, the state Equal Rights Amendment, has been interpreted to require equal treatment of fathers and mothers. See <u>Lowell</u> v. <u>Kowalski</u>, 405 N.E.2d 135, 139 (Mass. 1980). Statutory classifications of natural parents based on sex are also suspect under the Fourteenth Amendment of the United States Constitution. <u>See, e.g.</u>, <u>Stanley</u> v. <u>Illinois</u>, 405 U.S. 645, 658 (1972) (holding that a state could not presume unfitness of unwed fathers but not unwed mothers).

Supreme Judicial Court determined that the father had shared legal custody.

The government contends that C.M.J. is distinguishable on its facts because the children in that case resided with both natural parents, while here the parents lived separately. The government thus appears to argue that, absent a decree, the father can secure legal custody only through residence with the child. We think that C.M.J. cannot be confined to its specific facts. While Massachusetts law, like the INS regulations,[4] may create a presumption of legal custody in residence situations, nothing in C.M.J. suggests that residence is the only way to acquire legal custody rights. Indeed, if residence creates a presumption of legal custody, the INS regulations necessarily suggest that legal custody may be obtained by other means when residence is absent. And in other contexts where state law is not to the contrary, the BIA itself has recognized that the father of a child born out of wedlock who has legitimated the child should be presumed to share legal custody, even in the absence of a court decree. See Matter of Rivers, 17 I&N Dec. 419, 423 (BIA 1980) ("Unless there is

_____

[4]    8 C.F.R. § 320.1(1) creates a rebuttable presumption of legal custody by a U.S. citizen parent "[i]n the case of a biological child born out of wedlock who has been legitimated and currently resides with the natural parent." The IJ appears to have determined that this presumption applied to Pina. We need not decide whether the presumption is applicable, because we find that Pina's father had legal custody of him regardless of whether the predicates for the presumption were satisfied.

evidence to show that the father of a legitimated child has been deprived of his natural right to custody, he will be presumed to share custody with the mother.").

Massachusetts statutes and cases suggest that in situations in which a child was born out of wedlock, as well as in divorce situations, agreements between the parents as to the upbringing and legal custody of the child are favored. See, e.g., Mass. Gen. Laws ch. 208, § 31 ("Where the [divorcing] parents have reached an agreement providing for the custody of the children, the court may enter an order in accordance with such agreement, unless specific findings are made by the court indicating that such an order would not be in the best interests of the children."); In re Custody of Zia, 736 N.E.2d 449, 457 n.16 (Mass. App. Ct. 2000) ("It goes without saying that we encourage parental agreement in the sensitive area of child custody when it is possible and in the best interests of the child."). Section 10(a) itself recognizes that courts in making formal custody determinations should give weight to the fact that "parents have successfully exercised joint responsibility for the child prior to the commencement of proceedings." Mass. Gen. Laws ch. 209C, § 10(a).[5]

---

[5] Other courts have enforced voluntary custody and support agreements between parents even though those agreements were not filed with a court. See, e.g., Duffy v. Duffy, 881 A.2d 630, 632 (D.C. 2005) (enforcing agreement between divorcing parties as to, inter alia, "the legal and physical custody of their daughter").

-14-

At oral argument we called the parties' attention to section 11(b) of chapter 209C of the Massachusetts General Laws, and requested further briefing as to the effect of that section. Both parties recognize that section 11(b) specifically provides that "[i]f a mother and father execute a voluntary acknowledgment of parentage . . . , they may also make agreements regarding custody, support, and visitation," and further provides that courts shall honor such absent a finding that they are not in the best interests of the child. However, the government argues that section 11(b) requires that the agreements be filed with the court.[6] The petitioner disagrees, arguing that such filing is not required.

The statute on its face only permits the parents to file such an agreement, providing that "[s]uch agreements _may_ be filed with any court with jurisdiction." Mass. Gen. Laws ch. 209C, § 11(b) (emphasis added). While the statute also provides that agreements related to custody "must" be filed "with a division of the probate and family court department in the judicial district or county in which the child and one of the parents lives," id., this language seems clearly designed only to specify the court in which the custody agreement "must" be filed if the parents elect to file the agreement with a court. Notably, the statute does not provide

---

    [6] Section 11(b) provides that "[s]uch agreements, if filed with and approved by the court shall have the same force and effect as a judgment of the court." Mass. Gen. Laws ch. 209C, § 11(b).

that such agreements are ineffective if not filed with the court. Given the language of the statute and that Massachusetts favors parental agreements with regard to custody, we think section 11(b) cannot be construed to require that such an agreement be filed with the court.

Thus, the informal agreement here between Pina's parents to share legal custody of him is entitled to effect. The government has conceded that, under that agreement, Pina's father exercised the rights and responsibilities associated with legal custody. Accordingly, the CCA's requirement that, at the time the statute went into effect, Pina was "in the legal . . . custody of the citizen parent"--that is, his father--is satisfied.[7]

### III.

For the foregoing reasons, the removal order issued by the IJ is <u>vacated and remanded</u> for further proceedings not inconsistent with this opinion.

---

[7] While the IJ determined that Pina's father also had shared physical custody of him, the BIA did not address that issue, and we may not conduct our own de novo inquiry. <u>I.N.S.</u> v. <u>Orlando Ventura</u>, 537 U.S. 12, 16 (2002). If the government elects to challenge that finding, the BIA may consider it on remand.