COMMONWEALTH *vs.* PERDITE SCOTT.[1]

Middlesex. November 6, 2003. - January 8, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Motion to suppress, Findings by judge. *Constitutional Law,* Search and seizure, Reasonable suspicion. *Search and Seizure,* Threshold police inquiry, Probable cause, Reasonable suspicion. *Threshold Police Inquiry.*

The judge hearing a pretrial motion to suppress evidence properly concluded that, when the defendant was seized, the State trooper did not have reasonable suspicion that the defendant was the person who committed the crimes at issue, and thus violated the defendant's rights under art. 14 of the Declaration of Rights of the Massachusetts Constitution, where the judge's subsidiary finding that the trooper was unable to see the distinguishing facial characteristics of the defendant from fifteen to twenty feet was not clearly erroneous. [646-649]

INDICTMENTS found and returned in the Superior Court Department, two on September 30, 1998, and five on February 8, 1999, respectively.

A pretrial motion to suppress evidence was heard by *Charles T. Spurlock,* J., and following review by the Appeals Court, 52 Mass. App. Ct. 486 (2001), further proceedings were had before him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Randall K. Power* for the defendant.

*Marian T. Ryan,* Assistant District Attorney (*Esther M. Bixler Piszczek,* Assistant District Attorney, with her) for the Commonwealth.

COWIN, J. The defendant, Perdite Scott, was indicted for vari-

---

[1] In two of the seven indictments, the defendant's first name appears as Pendite.

ous offenses[2] in connection with two sexual assaults that oc-
curred along the Charles River in Cambridge in June and July
of 1998. A Superior Court judge allowed the defendant's mo-
tion to suppress statements and other evidence derived from his
stop and arrest on September 8, 1998. A single justice of this
court granted leave for the Commonwealth to pursue an
interlocutory appeal, and reported the case to the Appeals Court.
The court concluded that the judge's findings were insufficient,
vacated the suppression order, and remanded the matter for the
judge to supplement his findings. *Commonwealth* v. *Scott,* 52
Mass. App. Ct. 486, 496 (2001). On remand, the judge held a
further evidentiary hearing, conducted a daytime view of the
location where the stop occurred, made additional findings, and
again allowed the defendant's motion to suppress. The Com-
monwealth sought and was granted a second interlocutory
review, and the Appeals Court reversed the order. *Com-
monwealth* v. *Scott,* 57 Mass. App. Ct. 36, 41 (2003). We granted
the defendant's application for further appellate review, and
now affirm the judge's order allowing the motion to suppress.

The background facts are necessary to put the judge's find-
ings into context.[3] On June 2, 1998, at 8 P.M., a woman was as-
saulted and raped on the sidewalk area between Greenough
Boulevard and the Charles River in Cambridge. The victim
described her assailant to police as a muscular black male over
six feet tall, with short hair and thick lips. On July 21, 1998, at
9 P.M., a second attack occurred in the same general area. This
victim described her assailant as a tall black male with short
hair, a thin build, and marks or freckles on his face. Sergeant
David Benoit of the State police investigated the attacks and
was familiar with these descriptions.

We now summarize the facts found by the judge after the
original hearing and on remand. On September 8, 1998, at 8:30
P.M., approximately the same time of night that both attacks had

---

[2]The defendant was charged with rape, rape as a second or subsequent of-
fense, assault with intent to rape (two indictments), assault and battery (two
indictments), and indecent assault and battery.

[3]The judge made no findings regarding these background facts. Although
the judge specifically discredited some of the testimony at the motion hearing,
there is no reason to believe that he rejected these background facts. Indeed,
his findings implicitly assume the existence of the underlying facts.

taken place, Sergeant Benoit, wearing a State police jacket, was driving his cruiser on Greenough Boulevard in the area where the attacks had occurred. Benoit observed a black male, later identified as the defendant, on the other side of the road, approximately one hundred feet away and walking toward him. It was one hour after sunset, and the street was illuminated by light posts spaced about thirty feet apart on the side of the road. As Benoit's cruiser approached, the defendant left the sidewalk and walked into a wooded area along the banks of the Charles River. Benoit had the headlights of his cruiser pointed in the direction of the defendant, and believed that the defendant fit the general description of the assailant (a black male over six feet tall) from the June and July attacks. Benoit stopped his cruiser at the side of the road thirty to forty feet behind the defendant, who was now walking on a narrow dirt path "surrounded by trees and heavy vegetation that formed a tunnel over the path." In that area, the ground slopes down at an angle of about thirty degrees. Benoit stepped out of his vehicle, turned his cruiser's spotlight on the defendant (there was no artificial street lighting on this brushy area) and, using his loudspeaker, told the defendant to come back because he wanted to speak to him. The defendant complied by walking toward the cruiser. When the defendant was fifteen to twenty feet away, Sergeant Benoit ordered him to stop and remain still. Benoit testified that from this distance he could observe that the defendant, in addition to being tall and black, had thick lips and very short hair, was very muscular, and "appeared to have some small marks on his face."[4] Benoit radioed for assistance. When another State trooper arrived, the two officers approached the defendant and searched his bag. The search revealed various personal effects and many condoms.[5] Sergeant Benoit questioned the defendant and learned that his middle name was "Lee." Because one of the victims reported that her assailant had said that his middle name was "Lee," Sergeant Benoit placed the defendant in the

[4]Neither the judge's findings nor the transcript make it clear whether Benoit made these particular observations, which are key to the reasonable suspicion analysis, before he ordered the defendant to stop. All parties proceed under the assumption that he did so; thus, we do as well.

[5]Testimony at the motion hearing was that condoms had not been used in the attacks.

rear seat of a cruiser and, while the defendant was seated in the cruiser, advised him of his Miranda rights. Eventually Sergeant Benoit placed the defendant under arrest. The defendant was later transported to the State police barracks where his mugshot was taken. That photograph was placed into an array, and the victim of the July attack identified the defendant as her assailant.

The judge determined that the defendant was seized when he was from thirty to forty feet from Sergeant Benoit, at the moment Benoit turned on the spotlight and spoke to him through the cruiser's loudspeaker. The judge concluded alternatively that a seizure occurred when the defendant was from fifteen to twenty feet from Sergeant Benoit and was told to stop and remain still. Although the encounter occurred at night, the judge conducted a daytime view of the area, and stated that "those pockmarks, if they exist,[6] cannot be seen from a distance of four feet in broad daylight."[7] Therefore, the judge explicitly discredited Benoit's testimony that these marks, the only physical characteristic that would distinguish the defendant from any other black male of approximately the same height and build, could be seen at a distance of from fifteen to twenty feet at night, even with the aid of a spotlight. Similarly, the judge chose not to believe Benoit's testimony that he was able to see the relative size of the defendant's lips under those same conditions. Discrediting these observations, the judge ultimately determined that the trooper lacked the requisite reasonable suspicion to justify a threshold inquiry. The Appeals Court reversed, concluding that Benoit had reasonable suspicion for the stop. *Commonwealth* v. *Scott*, 57 Mass. App. Ct. 36, 38-39

---

[6]It is not clear why the judge, having viewed the defendant, was uncertain about the existence of the pockmarks.

[7]The Commonwealth argues that we should not give deference to the judge's observations during the view because the view was taken "under completely different circumstances and three years after the defendant's arrest." There is no relationship between what happened on the view and the judge's credibility determination. The only observation of significance made by the judge on the view is that the defendant's facial characteristics could not be seen from four feet. The view was not conducted in circumstances identical to those at the time of Sergeant Benoit's stop of the defendant; thus, the judge's observations could have been made as easily in the court room. Findings may be based on such observations. Cf. *Commonwealth* v. *Kater*, 388 Mass. 519, 535 (1983), *S.C.*, 394 Mass. 531 (1985), 409 Mass. 433 (1991), 412 Mass. 800 (1992) (prosecutor may comment on defendant's appearance at trial).

(2003). We conclude, based on the judge's findings of fact, that reasonable suspicion for the stop was lacking, and the motion to suppress was properly allowed.

The issue before us is whether the judge erred in concluding that, when the defendant was seized, the State trooper did not have reasonable suspicion that the defendant was the suspected assailant, and thus violated the defendant's rights under art. 14 of the Declaration of Rights of the Massachusetts Constitution.[8] The resolution of this issue turns on the judge's subsidiary finding that Benoit was unable to see the facial characteristics of the defendant from fifteen to twenty feet; for, as the Appeals Court observed, if the judge had believed Benoit's testimony, there is no question the stop would have been proper. *Commonwealth* v. *Scott, supra* at 38. In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error "but conduct an independent review of his ultimate findings and conclusions of law." *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). The judge determines the weight and credibility of the testimony. *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321 (2001), quoting *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

In order for a police investigatory stop to be justified under art. 14, the police must have "reasonable suspicion" to conduct the stop. *Commonwealth* v. *Cheek*, 413 Mass. 492, 494 (1992), citing *Commonwealth* v. *Lyons*, 409 Mass. 16, 18 (1990). To be "reasonable" under this standard, the officer's suspicion must be grounded in " 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.' " *Commonwealth* v. *Lyons, supra* at 19, quoting *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984).

In this case, it is clear that the trooper's command to the

---

[8]We need only focus on the defendant's arguments under art. 14 of the Massachusetts Declaration of Rights, *Commonwealth* v. *Cheek*, 413 Mass. 492, 494 (1992), because a search that is valid under art. 14 will be valid under the Fourth Amendment to the United States Constitution. See *Commonwealth* v. *Cast*, 407 Mass. 891, 907 (1990), and cases cited.

defendant to stop and remain fifteen to twenty feet away was a directive that curtailed the defendant's freedom to leave or move, and amounted to a seizure, see *Commonwealth* v. *Grandison*, 433 Mass. 135, 138 (2001), and cases cited. Because we conclude that reasonable suspicion for a stop did not exist even at fifteen to twenty feet, we need not decide whether a seizure occurred at the earlier point, i.e., when the trooper first called to the defendant from a distance of thirty to forty feet.

The Commonwealth argues that reasonable suspicion existed for the stop. Its position is that the judge's finding to the contrary is based on his subsidiary finding regarding Benoit's inability to see the defendant's facial characteristics, and that that subsidiary finding is erroneous. The Commonwealth claims that the physical characteristics of the defendant, as well as the defendant's presence near the location of the attacks seven weeks after the second attack at approximately the same time of night, provided Benoit with reasonable suspicion for the stop. In particular, the Commonwealth maintains that reasonable suspicion was provided by the defendant's thick lips and the marks on his face, physical characteristics that were consistent with at least one victim's description, and that Benoit testified he had noticed prior to the stop. The Commonwealth argues that this testimony was improperly discredited.[9] We are bound by the facts found by the judge. See *Commonwealth* v. *Yesilciman, supra* at 743. We have consistently held that, on a motion to suppress, absent clear error, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not [of] this court." *Id.*, quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), and cases cited. There was no clear error here. Therefore, we will not disturb the finding of the judge that,

[9]The Commonwealth relies on *Commonwealth* v. *Dedominicis*, 42 Mass. App. Ct. 76 (1997), for the proposition that the judge should not have used his own subjective view to justify discrediting Benoit's testimony. There, the judge credited the testimony of an officer regarding a search, but still ruled that the search had been unreasonable based on his own observations during an in-court reenactment of the frisk of the defendant. *Id.* at 78-79. In this case, there was no such contradiction, as the judge did not make any explicit finding that Benoit's testimony was credible.

when the defendant was seized, Sergeant Benoit was unable to see whether the defendant had thick lips and marks on his face.[10]

Taking into consideration only the information possessed by Sergeant Benoit at the time of the stop, as found by the judge, there was no reasonable suspicion to conduct a threshold inquiry pursuant to art. 14. See *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968); *Commonwealth* v. *Lyons, supra* at 19; *Commonwealth* v. *Wren, supra* at 707. There was no finding, nor even any evidence, that the defendant was engaged in any suspicious activity at the time of his encounter with Sergeant Benoit. Cf. *Commonwealth* v. *Mercado, supra* at 371 (police may consider evasive behavior, proximity to scene, and general description in combination to narrow range of suspects). Because the judge discounted the observations of the defendant's facial characteristics, Sergeant Benoit knew only that the defendant was in the same vicinity where the attacks had occurred about two months earlier at about the same time of night, and that the defendant fit the general description of a tall, muscular, black male. The judge did not err in concluding that this general description and the defendant's location, even when considered together, did not amount to reasonable suspicion. See *Commonwealth* v. *Cheek*, 413 Mass. 492, 496 (1992) (concluding that officer did not have reasonable suspicion to stop suspect fitting general description of "black male with a black 3/4 length goose [jacket]" walking

---

[10]The Appeals Court concluded that the seizure occurred when the defendant was ordered to stop fifteen to twenty feet from Sergeant Benoit, and that at that juncture Benoit had reasonable suspicion for the stop. *Commonwealth* v. *Scott*, 57 Mass. App. Ct. 36, 37-39 (2003). The court relied in part on *Commonwealth* v. *Ceria*, 13 Mass. App. Ct. 230, 231 (1982), where the court concluded that the officers had reasonable suspicion for a stop because they were familiar with a composite, they could see that the defendant matched the composite, and the defendant used a moped, a distinctive mode of transportation. Apparently determinative to the Appeals Court in this regard was Sergeant Benoit's testimony that he had been assigned to investigate the attacks and that he was familiar with the composite drawings of the suspect prior to encountering the defendant. *Commonwealth* v. *Scott, supra* at 38-39. The judge made no findings regarding Benoit's familiarity with the composite or reliance on the composite as a basis for the stop. Even if Sergeant Benoit were recalling the composite at the time he stopped the defendant, we are bound by the judge's finding that at that time Benoit could not discern any distinguishing facial characteristics of the defendant. This is in contrast to the officers in the *Ceria* case, who could see the characteristics that distinguished that defendant. The judge's credibility determination ends this inquiry.

in general area where crime had recently occurred). As the stop of the defendant was illegal, we need not consider the propriety of any of the events that followed.

The order allowing the motion to suppress is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*