NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11683
SJC-11937


COMMONWEALTH  vs.  RONALD C. DAME.


Worcester.     November 6, 2015. - February 3, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Constitutional Law, Delay in commencement of
     prosecution, Search and seizure, Probable cause.  Due
     Process of Law, Delay in commencement of prosecution.
     Deoxyribonucleic Acid.  Probable Cause.  Search and
     Seizure, Motor vehicle, Probable cause.  Practice,
     Criminal, Capital case, Indictment, Delay in commencement
     of prosecution, Motion to suppress, Harmless error,
     Execution of sentence, Sentence.  Error, Harmless.




Indictment found and returned in the Superior Court
Department on November 20, 2006.

A motion to dismiss was heard by James R. Lemire, J.; a
pretrial motion to suppress evidence was heard by Peter W.
Agnes, Jr., J.; and the case was tried before Richard T. Tucker,
J.
A motion for a stay of sentence filed in the Supreme
Judicial Court was referred to Spina, J., and was considered by
him.


Theodore F. Riordan (Deborah Bates Riordan with him) for
the defendant.
Donna-Marie Haran, Assistant District Attorney, the
Commonwealth.

CORDY, J.  Clara Provost (victim) was brutally murdered in the bedroom of her apartment sometime after 10:30 P.M. on January 6 or early in the morning hours of January 7, 1974.  The subsequent police investigation focused on several potential suspects.  A year of investigation produced a circumstantial but not very strong case against the defendant, including a brief prior dating relationship with the victim that apparently ended badly; a flawed alibi; fresh scratches on his face; and a handprint on the outside of the door through which the murderer forced entry into the apartment.[1]  No one was indicted for the murder, and the investigation became largely dormant.[2]

During the murder investigation in 1974, however, tissue was taken from under the fingernails of both hands of the victim and preserved.  More than twenty-five years later, analysis of this evidence proved decisive in the decision to prosecute the case.  As increasingly advanced methods of deoxyribonucleic acid

---

[1] The evidence also included the observations of two witnesses, one of whom saw a man parked in a truck near the victim's apartment when the witness left that apartment at approximately 10:30 P.M., and another who observed a man climb over a wall next to the victim's apartment building around midnight.  Neither could positively identify the defendant as the individual they saw that evening.

[2] There were periods of activity thereafter; for example, a number of the witnesses were reinterviewed in 1983 after a potential lead developed in the case involving another individual.  That lead did not pan out.

(DNA) analysis became more reliable, accurate, and accepted as evidence admissible in Massachusetts proceedings, Commonwealth v. Vao Sok, 425 Mass. 787, 789 (1997) (finding reliable and approving polymerase chain reaction analysis), a new era of investigation commenced.  The samples that had been preserved were analyzed and swabs were taken from the previously identified potential suspects.  The analysis identified the tissue that contained DNA as consistent with the defendant's DNA and inconsistent with the DNA of the other suspects.  This evidence, combined with the fresh scratches observed (and photographed) by the police on the defendant's face when he was interviewed the day after the murder in January, 1974, led to his indictment on November 20, 2006, and ultimately his conviction on February 24, 2012, of murder in the first degree on the theory of extreme atrocity or cruelty.[3]

The defendant raises several claims on appeal.  First, he challenges the denial of his pretrial motion to dismiss the murder indictment on the ground that the Commonwealth recklessly or negligently delayed indicting him for thirty-two years, prejudicing his defense.  Second, he claims error in the denial

---

[3] The case was submitted to the jury based on three theories of murder in the first degree:  premeditated murder, murder by extreme atrocity or cruelty, and felony-murder.  The underlying felony was armed burglary.  The jury were also instructed on theories of murder in the second degree, including felony-murder in the second degree, with the underlying felony being assault with intent to commit rape.

of his motion to suppress evidence of a paper towel that the police seized from his vehicle without probable cause to believe that evidence of the crime would be found in there. Finally, the defendant requests relief under G. L. c. 278, § 33E.

Just before he filed his appellate brief with this court, the defendant filed a motion to stay the execution of his sentence. The motion was referred by the full court to the single justice, who denied it. The defendant's appeal from the denial of this motion was consolidated with his direct appeal.

Although we agree that the paper towel should have been suppressed,[4] we affirm the defendant's conviction, as well as the denial of his motion to stay the execution of his sentence. After a review of the record, we also decline to grant relief pursuant to G. L. c. 278, § 33E.

1. Background. We summarize the facts the jury could have found, reserving discussion of other evidence to our consideration of the legal issues raised.

The victim was twenty-three years old at the time of her death. She lived with her three and one-half year old son in the first-floor apartment of a multifamily residence at 30 Lunenburg Street in Fitchburg. The victim's parents, her

---

[4] Because of this conclusion, we need not reach the defendant's challenge to the admission in evidence of the paper towel on relevancy grounds.

brother, and three of her sisters lived in the second-floor apartment, which had a separate entrance off 13 Highland Avenue.

In late November 1973, the defendant met the victim at a country-western club. Shortly thereafter, the defendant took the victim on a date, at which time he engaged in oral sexual relations with her. They may have gone on at least one other date. After Thanksgiving and until the time of her murder, however, the victim began a regular dating relationship with another man, Gerard Duhaime, a soldier stationed at Fort Devens.

On Saturday, January 5, 1974, the victim and her sister Beatrice were walking to a local bar about five minutes from their residence when they saw the defendant drive by them very slowly. The victim's demeanor changed after this encounter; she had previously been very excited about going out with her sister. After arriving at the bar, the victim realized she had forgotten her driver's license and returned home alone to retrieve it. Her sister Sheila, who was at the victim's apartment taking care of the victim's son, testified that the victim returned to her apartment "in a rush," grabbed her driver's license on the table, and left. Beatrice testified that the victim took an unusually long time, more than one-half hour, to return to the bar, and when she returned it was as if "she was in another world. She wouldn't even talk."

On Sunday, January 6, 1974, the victim spent the day with her son and Sheila.  Sheila left the victim's apartment at around 6 P.M.  The victim asked Sheila to unlock the door downstairs for her boy friend, Duhaime, who was coming later that night.  Duhaime was at the victim's apartment from approximately 7:30 P.M. to 10:30 P.M.  He made sure the door was locked when he left.

On the way to his vehicle, Duhaime noticed a man sitting in a dark pick-up truck with the engine running, staring at him.  Duhaime made eye contact with the man a few times and the encounter made him "very uncomfortable" and "kind of nervous."  As Duhaime drove away in his vehicle, the truck followed him at a close distance with its headlights on, but turned off shortly thereafter.  After the victim's murder, the police showed Duhaime the defendant's photograph.  Duhaime said that the defendant's eyes reminded him of the same eyes, with "that same cold, mean look," he saw when he was leaving the victim's apartment on January 6.

That same evening, shortly after midnight, Steven Svolis was driving his vehicle in the area of Lunenburg Street when he saw a man jumping over the wall between the victim's apartment building and the building next to it.  Svolis described the man as being tall and thin, and having long straight hair on the top, which was consistent with Dame's appearance.  The man was

wearing a suede coat with sheepskin lining that was a "car-coat length," dark pants, light socks, and dark shoes.[5]

On January 6, 1974, Colleen Regan, a young woman who had been regularly dating the defendant since the prior year, told the defendant that she had plans to go on a date with another man that night. The defendant was upset about the date and went to her house to see if she would change her mind. Regan told the defendant she was going to go on the date, and he told her he would be at the Eastwood Club that evening. A few days later, Regan saw the defendant and observed that he had scratches on his face that were not there when she saw him on January 6.

On January 7, 1974, the victim was found lying on her bed, naked from the waist down. Blood was pooling on her bed. Her head was wedged between the headboard and the mattress and her throat had been severely slashed. During his examination of the crime scene, a State police trooper observed a smeared bloody handprint on the victim's left inner thigh. He also observed that the door to the victim's apartment had been forced open, with the latch broken. Other police officers found "some pieces of paper towel" on the floor in front of the stove. No usable fingerprints, besides those of the victim, were found in the

_____

[5] After reading about the victim's murder in the newspaper, Steven Svolis went to the police and reported what he had seen.

apartment.  On the front door, however, a palm print and three latent prints that matched the defendant's fingerprints were found slightly above the broken latch.  Scrapings from under the victim's fingernails from both hands were preserved because they contained human blood and skin tissue.

Later that day, the Fitchburg police interviewed the defendant.  There were several scratches on the defendant's left cheek, which were then photographed.  During the interview, the police went outside to the defendant's vehicle, opened the rear door, and retrieved a paper towel from the back seat area.  Sperm cells were later detected on the paper towel that was found in the defendant's vehicle.  The defendant was subsequently interviewed by the police multiple times in January, 1974.  No one was charged with the victim's murder.[6]

More than twenty-five years later, on December 1, 1999, a chemist at the State police crime laboratory sent samples from the paper towel found in the defendant's vehicle and from the fingernail scrapings to the Federal Bureau of Investigation

---

[6] The case file was opened briefly in 1983 based on a police interview in Keene, New Hampshire, after a woman accused a man with whom she had been in a prior relationship, George Dunton, of the victim's murder.  Police determined that he had nothing to do with the homicide.  This information was not presented at trial, although a deoxyribonucleic acid (DNA) analyst testified that she compared the DNA profile derived from the fingernail scrapings to Dunton's profile and excluded him as a potential source of the DNA present in the scrapings.

(FBI) for DNA testing.  Between 2000 and 2006, the police obtained DNA from the defendant, Duhaime, and George Dunton.[7]

The DNA samples were further tested by a DNA analyst in the State police crime laboratory in 2007 using more sophisticated analytical techniques.  A DNA profile was created for each of the three men.  The fingernail scrapings from the victim's right hand contained a single source male profile which "matched the DNA profile" from the defendant such that the defendant could not be excluded as a contributor to the sample.  Dunton and Duhaime were excluded as potential sources of DNA present in the fingernail scrapings.  Based on standard DNA testing, the probability of a randomly selected unrelated person having contributed DNA to this mixture was approximately one in 5,227 of the Caucasian population.[8]  Based on the more advanced short tandem repeat of the Y chromosome testing on the fingernail scrapings,[9,10] the defendant's profile would not have been

---

[7] The results of the testing by the Federal Bureau of Investigation were not admitted at trial, but excluded Dunton and Gerard Duhaime as possible contributors to the sample.  **Th**e defendant was not excluded as a contributor.  In 2007, more advanced DNA analysis was performed.  The results of this analysis were presented at trial.

[8] The defendant is Caucasian.

[9] Short tandem repeat of the Y chromosome (Y-STR) testing permits testing on smaller samples of DNA than other forms of DNA testing.

expected to occur more frequently than one in 2.2 million unrelated Caucasian males.[11]

As for the paper towel seized from the defendant's vehicle, the nonsperm fraction contained a mixture of DNA from more than one source, and the defendant matched the major male profile in that DNA mixture. The probability of a randomly selected individual unrelated to the defendant having a DNA profile matching that obtained from the nonsperm fraction was approximately one in 27.8 million of the Caucasian population.

At trial, the defendant denied that he broke into the victim's apartment and murdered her. He testified that during the night of the murder he was at the house of his sister, Theresa LaPlume, from about 7 P.M. until approximately midnight, and then went directly to his home. The defendant testified

---

[10] At trial, the DNA analyst explained that DNA analysis involves four steps: extracting a sample; determining the quantity of sample available; amplifying the locations of interest within the sample (of which there are fifteen that are used because they are "highly discriminating between individuals"); and converting the amplified sample into a visual product known as the DNA profile. STR testing involves the amplification process by which fifteen locations of interest are copied. Y-STR testing focuses on sequences of DNA found only on the Y-chromosome, so although the fifteen sites are shared between males and females, the Y-STR sequences are found only in males.

[11] At trial, defense counsel's legal assistant testified that she researched and constructed a family tree of the defendant's male relatives and determined that, in 1974, the defendant had twenty-four to twenty-five male relatives living in the Fitchburg area.

that his niece scratched his face while he was at his sister's house.  LaPlume died in 1993.  In rebuttal, the Commonwealth called Robert Powers, who testified that he saw the defendant at the Eastwood Club on January 6, 1974.  Specifically, Powers testified that he, his children, and his wife were at the club from approximately 7:30 P.M. to 9 or 9:30 P.M., and that during that time the defendant spoke with his wife.  He also testified that the defendant was still at the club when he and his family left.

2.  <u>Motion to dismiss</u>.  On appeal, the defendant argues that the judge erred in denying his motion to dismiss the indictment because of preindictment delay by the Commonwealth.  The defendant contends that the thirty-two year delay between the victim's murder and the return of the indictment against him prejudiced his defense to a degree constituting a violation of his due process rights.  The crux of the defendant's argument is that his alibi witness, his sister, died in 1993 and was therefore unable to testify in his defense, and that the Commonwealth was "reckless and/or negligent" in failing to charge him when she was still alive.

Due process principles intrinsic to the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights protect putative defendants from preindictment delays by the government that are intentional and

prejudicial.  Commonwealth v. Dixon, 458 Mass. 446, 458 (2010), citing United States v. Lovasco, 431 U.S. 783, 789 (1977) ("Due Process Clause has a limited role to play in protecting against oppressive delay").  A defendant seeking dismissal of an indictment due to preindictment delay "must demonstrate that he suffered substantial, actual prejudice to his defense, and that the delay was intentionally or recklessly caused by the government."  Commonwealth v. George, 430 Mass. 276, 281 (1999), and cases cited.  "[T]he burden of establishing the constitutional violation is a heavy one."  Commonwealth v. Best, 381 Mass. 472, 484 (1980).  The motion judge denied the motion on the ground that the defendant had not established either substantial actual prejudice or that the delay was intentionally or recklessly caused by the Commonwealth.  We agree with the judge's findings.

a.  Prejudice.  "The primary purpose of preindictment due process analysis is to assess prejudice to the defendant's ability to mount a defense."  King v. Commonwealth, 442 Mass. 1043, 1044 (2004), quoting Commonwealth v. Imbruglia, 377 Mass. 682, 691 (1979).  Although the preindictment delay surely caused some prejudice to the defendant's case, the circumstances do not give rise to the "severe prejudice" that would require the "drastic remedy" of dismissal of the indictment (citation

omitted).  <u>Commonwealth</u> v. <u>Fayerweather</u>, 406 Mass. 78, 87 (1989).

The defendant claims that LaPlume's testimony would have corroborated his alibi that he was at her home from approximately 7 P.M. to until shortly after midnight on the evening of the murder, and that she would have testified that her daughter, the defendant's niece, scratched his face, providing an explanation for how the defendant's face was scratched that evening.  The defendant claims that LaPlume's absence at trial was irremediable because, although he could testify himself as to his alibi, his testimony would have been bolstered by LaPlume's testimony.

We disagree with the defendant's assertion that the loss of LaPlume's testimony caused severe prejudice.  First, LaPlume's report to the police that the defendant arrived at her home on the night of the murder between 6:30 P.M. and 7 P.M. was contradicted by other noninterested witnesses who told the police that the defendant was at the Eastwood Club that night. One of those witnesses, Powers, told the police in January, 1974, and testified at trial that he saw the defendant at the Eastwood Club on January 6, 1974, from 7:30 P.M. until approximately 9 or 9:30 P.M.[12],[13]  In addition, during the

---

[12] The defendant argues that his alibi remains intact despite Robert Powers's testimony because Powers's statements do

investigation, LaPlume's husband contradicted LaPlume's report by telling the police that he left his house around 7:30 P.M. on the night of the victim's murder and that the defendant was not at the home.  Regan, who was dating the defendant at the time of the victim's murder, also testified that the defendant had told her at 6 P.M. that night that he would be at the Eastwood Club. Given these facts, we cannot conclude that LaPlume's testimony would have significantly aided the defendant's defense.

In addition to the reports contradicting LaPlume's statements about the defendant's whereabouts on the night of the murder, "[c]ommon sense and the case law dictate that the testimony of a blood relative of the defendant is inherently

not directly contradict Theresa LaPlume's time line as to where the defendant was after 9:15 P.M.  This dispute as to his whereabouts on the evening of murder was brought to the attention of the jury, as the defendant testified on his own behalf, stating that he went to LaPlume's home after leaving the Eastwood Club.  The jury were therefore aware of the limitations of Powers's testimony and could draw their own conclusions as to the defendant's whereabouts on the night of the murder.  See Commonwealth v. Cannon, 449 Mass. 462, 469 n.17 (2007) ("It is for the jury to make a determination of credibility").  Powers's statements do, however, directly contradict the defendant's testimony as to the time the defendant arrived at his sister's home.  This discrepancy would have permitted the jury to infer the defendant was never there.

[13] In his reply brief, the defendant argues for the first time that Powers was not a particularly credible witness because he was biased against the defendant, who had flirted with Powers's wife at the Eastwood Club.  We need not consider this argument, given that credibility determinations are for the jury and that defense counsel had an opportunity to elicit testimony on this point during his cross-examination of Powers but did not do so.

less credible than the testimony of other witnesses." Commonwealth v. Thomas, 429 Mass. 146, 153 (1999).[14] Here, where LaPlume's testimony would have been contradicted at trial by unrelated parties, we cannot conclude that her testimony would have been so powerful as to exculpate the defendant.[15] Additionally, the defendant was able to pursue his alibi defense through his own testimony at trial.[16]

_____

[14] The defendant also claims that, in deciding the motion to dismiss, it was improper for the motion judge to balance LaPlume's statements to the police against those made by other witnesses to the police because such credibility determinations are for the jury. We disagree, as it is implicit in the preindictment delay analysis that the judge must assess prejudice to the defendant's case by weighing the missing evidence against the other evidence to be presented at trial. See, e.g., Commonwealth v. Patten, 401 Mass. 20, 22 (1987) (judge reviews record to determine whether defendant has adequately demonstrated through "concrete evidence, and not simply by a fertile imagination, a reasonable possibility that access to the lost items would have produced evidence favorable to his cause"). Here, the judge properly considered the likelihood that LaPlume's testimony would have exculpated the defendant and concluded that the defendant had not demonstrated such a likelihood in light of the other evidence discussed.

[15] After interviewing witnesses who placed the defendant at the Eastwood Club (and not LaPlume's home) on the evening of January 6, 1974, the police confronted LaPlume. She began to shake and tear up and told the police to leave her house. The police also developed information that the defendant went to LaPlume's house at 8 A.M. on the morning of January 7, 1974, several hours after the murder.

[16] The defendant also argues that his constitutional right not to testify was infringed because, without LaPlume, the presentation of his alibi defense required him to testify. We disagree. See Commonwealth v. Toon, 55 Mass. App. Ct. 642, 651 n.12 (2002) ("That a defendant may need to testify or present evidence in order to raise self-defense does not violate State

Finally, "[t]he likelihood that the loss was prejudicial is eased by the reliability of the evidence presented by the government" (citation omitted). Imbruglia, 377 Mass. at 689. Here, the Commonwealth presented ample evidence from which the jury could find that the defendant murdered the victim, including the defendant's handprint on the door broken into by the killer; a photograph of the scratches on the defendant's face that Regan testified were not there when she last saw him earlier in the evening of January 6, 1974; and the DNA analysis comparing the defendant's DNA with that present in the blood and tissue scrapings taken from under the victim's fingernails.

Thus, the defendant has not shown that LaPlume's statements would have significantly aided his defense, see Lovasco, 431 U.S. at 783 ("every delay-caused detriment to a defendant's case should [not] abort a criminal prosecution"), and has failed to

---

or Federal constitutional privileges against self-incrimination"). See also Commonwealth v. Beauchamp, 49 Mass. App. Ct. 591, 606-607 (2000), quoting Williams v. Florida, 399 U.S. 78, 83-84 (1970) (that defendant felt "virtually compelled" to testify did not infringe on privilege against self-incrimination; "The defendant in a criminal trial is frequently forced to testify himself . . . in an effort to reduce the risk of conviction . . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination").

meet his burden of showing substantial actual prejudice to his defense as a result of preindictment delay.[17]

b. _Recklessness_. Dismissal of an indictment is only required where a defendant makes a persuasive showing of both actual prejudice and intentional or reckless conduct by the government that caused the delay. See _Imbruglia_, 377 Mass. at 691, citing _Lovasco_, 431 U.S. at 790 ("Proof of prejudice is a necessary, but not sufficient element of a due process claim"). Here, where the defendant concedes that the delay was not intentional, we focus our analysis on whether the preindictment delay was "incurred in reckless disregard of known risks to the

---

[17] The defendant also argues that, in addition to granting a new trial, this court should rule that LaPlume's statements to the police are admissible under _Commonwealth_ v. _Drayton_, 473 Mass. 23 (2015). In _Drayton_, we held that an otherwise inadmissible hearsay statement may be admissible if the statements were "critical to [the defendant's] defense" and bore "persuasive assurances of trustworthiness." _Id_. at 36, quoting _Chambers_ v. _Mississippi_, 410 U.S. 284, 302 (1973). We disagree with the defendant's assertion that the "narrow" constitutional principle governing the facts in _Drayton_, _supra_ at 32, applies in this case. As discussed, LaPlume's testimony was not "critical" to the defendant's defense because he was able to testify to the same information. Additionally, LaPlume's statements were contradicted by the statements of other witnesses, contrast _id_. at 27, 37-38 (witness's hearsay statements more trustworthy when corroborated by statements by other witnesses), and she had a familial relationship with the defendant, rendering her testimony inherently less credible than statements by the other noninterested witnesses in the case. See _Commonwealth_ v. _Thomas_, 429 Mass. 146, 153 (1999). While LaPlume consistently told the police that the defendant was at her home on the night of the murder, these latter two points weigh heavily against finding that LaPlume's statements bore "persuasive assurances of trustworthiness." _Drayton_, _supra_ at 36.

putative defendant's ability to mount a defense" such that dismissal is warranted.  Imbruglia, supra.  Although this case involves a considerable passage of time between the murder and the indictment, the defendant points to no facts in the record, nor do we discern any, that suggest recklessness by the Commonwealth in investigating the murder or bringing the indictments.  Instead, the defendant merely states that "[t]he delay was reckless."  Such a conclusory statement will not suffice to meet the defendant's heavy burden of proving a constitutional deprivation.  Commonwealth v. Ridge, 455 Mass. 307, 332 (2009), quoting Best, 381 Mass. at 484.

From our review of the record, it is apparent that the Commonwealth investigated at least one other potential suspect in the 1980s, and followed up on DNA testing as it became more widely available and approved as admissible evidence in the late 1990s.  The defendant contends that the fact that the results of the initial DNA testing done by the FBI were returned to the State police crime laboratory in 2001 belies the Commonwealth's contention that the DNA evidence is what motivated it to seek the indictment against the defendant in 2006.  To the contrary, after the initial DNA testing by the FBI, the Commonwealth reinvestigated the other potential suspects, took additional saliva samples, and retested the DNA samples using more advanced techniques as they became available.  These facts do not support

a finding of recklessness. See Lovasco, 431 U.S. at 791-792 (declining to adopt rule requiring government to file charges once probable cause has been established or once government has "assembled sufficient evidence to prove guilt beyond a reasonable doubt").[18]

The defendant also urges the court to depart from our holding in Imbruglia and conclude that a negligent delay may constitute a due process violation requiring dismissal of an indictment. We decline to do so. We recognize that negligent preindictment delay may amount to a constitutional violation in some cases, see, e.g., Howell v. Barker, 904 F.2d 889, 895 (4th Cir.), cert. denied, 498 U.S. 1016 (1990); however, such circumstances are not present here. Moreover, there is no reason to revisit our established rule where the defendant has otherwise failed to make the requisite showing of actual

---

[18] Although much of our inquiry focuses on the defendant's due process rights and corresponding ability to mount a defense, our analysis also incorporates some deference to the interests of prosecutorial discretion. "[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'" United States v. Lovasco, 431 U.S. 783, 791 (1977), quoting United States v. Ewell, 383 U.S. 116, 120 (1966). To the extent that the prosecution is required to make "'a necessarily subjective evaluation of the strength of the circumstantial evidence available and the credibility of the [defendant's] denial,' some delay is normal and justifiable." Commonwealth v. Best, 381 Mass. 472, 485 (1980), quoting Lovasco, supra at 793.

prejudice to his defense and is therefore not entitled to a dismissal of the murder indictment against him. We accordingly affirm the denial of the defendant's motion to dismiss the indictment for preindictment delay.

3. <u>Motion to suppress motor vehicle search</u>. The defendant also appeals from the denial of his motion to suppress paper towel evidence seized from his motor vehicle. The defendant concedes that the police had probable cause to believe he murdered the victim at the time his motor vehicle was searched. He argues, however, that the motion was wrongly denied because there was no probable cause to believe there was evidence of the crime in his vehicle, noting that the motion judge's ruling makes no findings about his vehicle being driven on the night of the crime or being otherwise involved in the crime.[19]

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" <u>Commonwealth</u> v. <u>Scott</u>, 440 Mass. 642, 646 (2004), quoting <u>Commonwealth</u> v. <u>Jimenez</u>, 438 Mass. 213, 218 (2002). Credibility determinations are "the province of the motion judge who had the opportunity to observe the witnesses."

---

[19] The defendant had access to at least two vehicles during this time period -- his father's pickup truck and a Chevrolet Super Sport vehicle. The paper towel was seized from the interior of the Chevrolet.

Commonwealth v. Johnson, 461 Mass. 44, 48 (2011). "Our review here is based on the facts as developed at the suppression hearing, not at trial." Id.

The motion judge found the following facts. On the evening of January 7, 1974, Fitchburg police Detective Joseph Carbone came into contact with the defendant, who had voluntarily come to the police station and was being interviewed by State police Lieutenant John J. Carney and Fitchburg police Detective Paul Keating. At one point, Carbone followed Detective David Caputi outside to the defendant's vehicle, which was parked at the police station. Carbone watched as Caputi opened the rear door to the defendant's vehicle and retrieved what Carbone perceived to be some rags or clothes from the back seat area (the parties agree the paper towel evidence was included). We assume that the Commonwealth could not establish that the search had been consented to by the defendant.[20]

Under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, warrantless searches "are per se unreasonable -- subject

---

[20] At the hearing on the motion to suppress, which took place in 2010, although there was testimony that police officers had a key to the defendant's vehicle, there was no witness available to the Commonwealth who could testify regarding the defendant's consent to the search. A report written by one of the police officers stating that the defendant had given permission for the warrantless search was excluded by the motion judge, and the officer who wrote the report was deceased.

only to a few specifically established and well-delineated exceptions" (citation omitted). Commonwealth v. Cast, 407 Mass. 891, 901 (1990). "One of those exceptions, commonly known as 'the automobile exception,' applies to situations where the police have probable cause to believe that a motor vehicle parked in a public place and apparently capable of being moved contains contraband or evidence of a crime." Commonwealth v. Bostock, 450 Mass. 616, 624, (2008). "The existence of probable cause depends on whether the facts and circumstances within the officer's knowledge at the time of making the search or seizure were sufficient to warrant a prudent man in believing that the defendant had committed, or was committing, an offense." Commonwealth v. Miller, 366 Mass. 387, 391 (1974). In determining whether the police had probable cause to search the defendant's vehicle without a warrant, we ask whether "the information possessed by police, at the time of the proposed warrantless search, provide[d] a substantial basis for the belief that there [was] a timely nexus or connection between criminal activity, a particular person or place to be searched, and particular evidence to be seized." Commonwealth v. Cataldo, 69 Mass. App. Ct. 465, 470 (2007), quoting Grasso & McEvoy, Suppression Matters under Massachusetts Law § 14-1[b], at 14-3 (2006).

We previously have found probable cause to conduct a warrantless search of a vehicle where facts indicated that there was a connection between the crime and the vehicle.  See, e.g., Commonwealth v. Gentile, 437 Mass. 569, 573-574 (2002) (probable cause existed to believe evidence concerning crime would be found in defendant's truck where, when victim was last heard from, she had been with defendant in his truck); Commonwealth v. Beldotti, 409 Mass. 553, 557 (1991) (probable cause existed to believe that evidence concerning crime would be found in defendant's home where defendant's motor vehicle was parked because defendant was with victim that morning and had driven his vehicle on day of murder).

In contrast, here the motion judge found no facts connecting the crime and the defendant's vehicle.  There was no finding that the defendant had driven the vehicle searched on the night of the murder or had otherwise used the vehicle in furtherance of the crime, nor were there any other facts found that would support an inference that evidence would probably be found therein.  We therefore conclude that the motion judge erred in denying the defendant's motion to suppress the paper towel evidence.

Given this error, we must determine whether the admission of that evidence requires a new trial.  Because the defendant properly preserved the issue, we ask whether the admission of

the evidence was harmless beyond a reasonable doubt. Commonwealth v. Hoyt, 461 Mass. 143, 154 (2011). "[T]o establish harmlessness beyond a reasonable doubt, the Commonwealth must show that other properly admitted evidence of guilt is 'overwhelming,' in the sense that it is 'so powerful as to "nullify any effect"' that the improperly admitted evidence 'might have had' on the fact finder or the findings." Commonwealth v. Vasquez, 456 Mass. 350, 362 (2010), quoting Commonwealth v. Tyree, 455 Mass. 676, 704 n.44 (2010). In undertaking this analysis we consider a number of factors, including "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt." Hoyt, supra at 155, quoting Commonwealth v. Dagraca, 447 Mass. 546, 553 (2006).

We conclude that the paper towel evidence was of marginal importance to the prosecution's case and the inferences the jury could draw from the evidence were limited. At trial, the Commonwealth called a "fiber analyst" to testify as to his examination of paper scraps found in the victim's apartment, and the paper towel taken from the defendant's vehicle. The analyst

opined that the scraps and the towel were consistent with being from the same manufacturer and were likely from the same batch or run. The witness was effectively cross-examined by defense counsel, admitting that he could not tell what company manufactured the towels and that a "batch or run" could be 70,000 or 80,000 rolls or more, depending on which company manufactured them and the size and speed of its manufacturing machinery.

At the end of the case, all that the prosecutor, in closing argument, said about the paper towel found in the defendant's vehicle was that the fact that the paper towel had the defendant's DNA on it showed that it was in fact recovered from the defendant's vehicle in 1974, and that the pattern on the scraps of paper found by the police in the victim's apartment was more like patterns found on paper towels than napkins. [21,22]

Moreover, to the extent that the paper towel evidence permitted an inference that the defendant had been in the victim's apartment the night of the murder, there was other powerful evidence from which the jury could draw a similar inference, including the defendant's palm and fingerprints on

---

[21] The paper towel was mentioned in just two paragraphs of the prosecutor's thirteen-page closing argument.

[22] Defense counsel had questioned a witness as to whether the scraps were actually of napkins brought to the victim's apartment that night by Duhaime.

the forced door of the victim's apartment and the DNA found under her fingernails. We conclude that any prejudice to the defendant's case caused by the admission of the paper towel evidence was harmless beyond a reasonable doubt.[23]

4. Denial of motion to stay execution of sentence. The defendant lastly claims that the single justice erred in denying his motion to stay the execution of his sentence. We review the denial of the motion for abuse of discretion. See DiPietro v. Commonwealth, 369 Mass. 964, 964 (1976). Such discretion is governed by two considerations: the defendant's likelihood of success on appeal and whether the defendant poses a security risk. Commonwealth v. Cohen (No. 2), 456 Mass. 128, 132 (2010). As to the second factor, "[s]ignificant considerations include the defendant's familial status, roots in the community, employment, prior criminal record, and general attitude and demeanor" (citation and quotation omitted). Commonwealth v. Charles, 466 Mass. 63, 77 (2013).

---

[23] In his closing argument, the prosecutor argued that the defendant was the perpetrator of the murder principally based on his fingerprints, the DNA evidence, the observations of Duhaime on the night of the murder, and the defendant's apparent false alibi. The prosecutor further argued that the defendant was guilty of murder in the first degree under all three theories, including murder occurring during the course of an armed burglary. The only mention of a possible attempted sexual assault came at the beginning of his closing, and was based on the position of the victim's body, "legs spread apart and naked from the waist down," and not on the paper towel found in the defendant's vehicle.

The latter consideration alone supports denial of the motion. It is presumed that a defendant charged with murder in the first degree is not entitled to bail. Farley v. Commonwealth, 433 Mass. 1004, 1004 (2000). Moreover, where the defendant was convicted of brutally murdering the victim, and where he did not submit any evidence of ties to family or the community, we are not persuaded that he did not pose a security risk.[24] Given this, we conclude the single justice did not abuse his discretion in denying the defendant's motion.

5. Review under G. L. c. 278, § 33E. After a review of the entire record, we discern no reason to exercise our powers to grant a new trial or reduce the degree of guilt. Although the defendant's trial was not error free, we conclude that there is no miscarriage of justice requiring a new trial, and accordingly, the defendant's conviction is affirmed.

So ordered.

---

[24] The defendant argued in his motion to stay execution of sentence that evidence of his "roots in the community" was supported by the testimony of defense counsel's legal assistant, who performed genealogical research of the defendant's family and found several male relatives living in the area. Because the defendant made no assertion as to his relationship with any of his relatives, we cannot conclude he had ties to the community.