NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1528                                            Appeals Court

COMMONWEALTH  vs.  JAMES CHARLES HILAIRE.

No. 16-P-1528.

Plymouth.     October 6, 2017. - February 21, 2018.

Present:  Wolohojian, Maldonado, & Wendlandt, JJ.


Armed Home Invasion.  Robbery.  Firearms.  Constitutional Law,
    Search and seizure, Reasonable suspicion.  Search and
    Seizure, Reasonable suspicion.  Evidence, Judicial notice.
    Practice, Criminal, Motion to suppress, Findings by judge.



    Indictments found and returned in the Superior Court
Department on October 29, 2014.

    A pretrial motion to suppress evidence was heard by
Cornelius J. Moriarty, II, J.

    An application for leave to prosecute an interlocutory
appeal was allowed by Fernande R. V. Duffly, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


    David D. Nielson for the defendant.
    Carolyn A. Burbine, Assistant District Attorney, for the
Commonwealth.


    WOLOHOJIAN, J.  At issue is whether there was reasonable

suspicion to stop the defendant and search his backpack several

hours after an armed home invasion had occurred nearby.  Taking judicial notice of demographic data he located on his own initiative, the Superior Court judge concluded there was reasonable suspicion and denied the defendant's motion to suppress.  The demographic data should not have been relied upon, both because the judge should not have expanded the factual record with independent research taken on his own initiative without notice to the parties and because they were not relevant.  Nonetheless, we affirm the denial of the motion to suppress because we conclude that the facts elicited at the evidentiary hearing established reasonable suspicion to stop the defendant.[1]

On July 29, 2014, at approximately 3:05 A.M., East Bridgewater police responded to the area of 601 North Central Street to investigate a report of an armed home invasion with shots fired.[2]  It was reported that a large amount of cash and jewelry had been taken.  The suspects were described as several young black males, two of whom were carrying backpacks.  There was no further description of the men, their features, or their

---

[1] The case is before us on the defendant's interlocutory appeal, which was allowed by a single justice of the Supreme Judicial Court.

[2] We recite the facts as the judge found them, supplemented by undisputed facts established during the evidentiary hearing on the motion to suppress because the judge credited the sole witness's testimony.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

appearance, except that they were said to be wearing "regular clothes."

A short time after the home invasion, three black men fled from a red Toyota Camry in front of 505 North Central Street, leaving the doors of the vehicle open as they ran into neighboring woods. 505 North Central Street is only about 100 yards from the location of the home invasion.

A large number of officers converged on the scene. One of them, Talitha Connor, stood near the abandoned Toyota while other officers searched the woods. As she was positioned there, Connor observed a black Acura driving up and down North Central Street. Connor stopped the vehicle and asked its driver, Ashley Smith, what she was doing. Smith responded that she was lost and trying to get back to Brockton. Connor allowed Smith to go on her way, but wrote the registration number of the vehicle on her hand.

Officer Dennis Andre was called in to duty around 5:00 A.M. Andre's first assignment was to transport to the station a slender-built black male who had been taken into custody in connection with the home invasion. Andre then returned to the area near the scene to continue patrolling for the two suspects who remained at large.

At approximately 7:15 A.M., Andre saw a dark-colored sedan "bang[] a U-turn" in the middle of an intersection during a red

light.  He stopped the vehicle, which was driven by Ashley Smith, and radioed in the registration information.  Smith again explained she was lost and trying to get back to Brockton.  Andre gave Smith directions, which he testified as just "basically two streets, and then you're [on] Plain Street in Brockton."  Smith responded that "she was familiar with Plain Street in Brockton and could make it home from there."

Andre then returned to the station where he learned from Connor about her earlier encounter with Smith, and the fact that Smith had given both of them the same explanation for her presence in the area.  Because Connor had written the registration on her hand, the two officers were able to confirm that Smith was driving the same vehicle on both occasions.

Andre returned to his patrol.  Around 8:00 A.M., he observed the same vehicle.  Smith was again at the wheel, and was talking on a cellular telephone (cell phone).  She was traveling from Brockton into East Bridgewater towards the North Central Street area.  Andre stopped the vehicle and asked Smith why she had returned to East Bridgewater given her earlier repeated statements about wanting to go to Brockton instead.  Smith stated that she was returning to her mother's friend's house.  Andre asked with whom she had been speaking on the cell phone.  Smith denied having a cell phone.  Andre remarked that he had just seen her on the cell phone, prompting Smith to no

longer deny the cell phone's presence but instead to claim it was her mother's cell phone. Smith retrieved the cell phone from the driver's side door panel, handed it to Andre, and consented to his looking at it. Andre saw a recent text message time-stamped 7:51 A.M. that read, "Did you pick him up yet?" Although Smith claimed she knew nothing about the message, she acknowledged that the cell phone had been in her possession all day. Smith was asked to accompany other officers to the station for further questioning.

Andre returned to his patrol. At around 9:00 A.M., he heard a radio report that a black male wearing a backpack had been spotted walking on North Central Street. Andre drove to the location immediately and saw the defendant, a black male, with a backpack, walking by himself on the sidewalk while talking on a cell phone. He was approximately one-half mile from the site of the crime.

Andre parked his cruiser halfway on the sidewalk just ahead of the defendant, and approached to speak with him. The officer asked the defendant where he was coming from, and he responded by turning around and pointing toward 601 North Central Street. Andre said he wanted to look in the defendant's backpack, and the judge found that "[t]he defendant did not argue but rather acquiesced to [Andre's] request." Inside were large amounts of currency and jewelry.

The defendant was indicted on five counts of armed home invasion, G. L. c. 265, § 18C; three counts of armed robbery while masked, G. L. c. 265, § 17; and one count of unlawful possession of a firearm, G. L. c. 269, § 10(a).  He filed a motion to suppress on the ground that there was no reasonable suspicion to stop him.  In essence, he argued then (and argues now) that given the lack of particularity in the description of the suspects (young black men wearing regular clothes and backpacks), and the temporal (six hours) and spatial (one-half mile) distance from the crime, there was no reasonable suspicion that he "was committing, had committed, or was about to commit a crime."  Commonwealth v. Warren, 475 Mass. 530, 534 (2016), quoting from Commonwealth v. Martin, 467 Mass. 291, 303 (2014).

The motion judge conducted an evidentiary hearing at which Andre was the sole witness, and later denied the motion in a detailed written memorandum.  The judge determined that the defendant had been seized when Andre said he wanted to look in the defendant's backpack.  The judge accordingly analyzed whether reasonable suspicion existed at that moment in time.  As part of that analysis, he considered the factors laid out in Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554-556 (2002), and found that "the physical description of the suspects was general and lacking in detail.  The area is not a high crime area and the defendant took no evasive action when confronted by

[Andre].  More importantly[,] over six hours had elapsed between the time the suspects fled into the woods and the time the defendant was stopped."[3]  None of these findings is clearly erroneous.  In addition, the judge correctly stated the law that, while a description "need not be so particularized as to fit only a single person, . . . it cannot be so general that it would include a large number of people in the area where the stop occurs."  Commonwealth v. Depina, 456 Mass. 238, 245-246 (2010).  The judge then continued by reasoning that:

> "A description of the suspects 'as young black men wearing backpacks' may, depending on geography, fit a large number of men in the area.  However, that is not likely in East Bridgewater.  Although there was no evidence presented on the point, I take judicial notice of the fact that the African-American, black population of East Bridgewater is decidedly small.  According to the records of the United States Census Bureau, less than 1% of the population of East Bridgewater was black or African-American as of July, 2014."

Discussion.  In reviewing a ruling on a motion to suppress we "review independently the application of constitutional principles," but "we accept the judge's subsidiary findings of fact absent clear error" (quotations omitted).  Commonwealth v. Leslie, 477 Mass. 48, 53 (2017).  "Our review . . . is based on the facts as developed at the suppression hearing, . . . "  Commonwealth v. Dame, 473 Mass. 524, 536, cert denied, 137 S.

---

[3] The judge also correctly noted that the gravity of the crime and the danger of the circumstances could be weighed favorably in the reasonable suspicion calculus.

Ct. 132 (2016), quoting from Commonwealth v. Johnson, 461 Mass. 44, 48 (2011), where the judge has "the responsibility of determining the weight and credibility to be given . . . [the] testimony presented," Commonwealth v. Wilson, 441 Mass. 390, 393 (2004), and where the parties have the opportunity to examine and cross-examine the witnesses. We are presented here with subsidiary findings that do not rest solely on evidence obtained through this customary procedure. Instead, the judge's subsidiary findings rest in part on information he obtained through independent research, apparently conducted on the Internet,[4] of which he took judicial notice, after the evidentiary hearing had concluded, and without notice to (or input from) the parties. Our first question, therefore, is whether we must accept subsidiary fact findings made in this manner even though they have not been shown to be clearly erroneous. We conclude for several reasons that we do not.

We begin by noting that we have not found, nor have the parties pointed us to, any reported decision, in this jurisdiction or elsewhere, in which adjudicative facts[5] found by

_____

[4] The parties at oral argument were in agreement that the information was apparently obtained from the Internet.

[5] Adjudicative facts are "the kind of facts that go to a jury in a jury case," Reid v. Acting Commr. of the Dept. of Community Affairs, 362 Mass. 136, 142 (1972), quoting from Davis, Administrative Law Treatise, § 7.02. By contrast, "[l]egislative facts are those facts, including statistics,

judicial notice have formed the basis for ruling on a motion to suppress. This is not surprising because suppression hearings are critical proceedings, at which the defendant has the constitutional right to be present, to present evidence, and to cross-examine the Commonwealth's witnesses,[6] see Robinson v. Commonwealth, 445 Mass. 280, 285-286 (2005); Doe v. Sex Offender Registry Bd. No. 941, 460 Mass. 336, 340 (2011); see also Mass.R.Crim.P. 18(a), 378 Mass. 888 (1979), and taking judicial notice of subsidiary facts in the manner the judge did here threatened these rights. Moreover, although demographic data published by the United States Census Bureau is the type of information susceptible to judicial notice, see Mass. G. Evid. 201(b)(2) (2017), it is not appropriate to use the mechanism of judicial notice to connect a defendant to the description of suspects or to a crime. See Mass. G. Evid. § 201(c) ("a court shall not take judicial notice in a criminal trial of any

---

policy view, and other information, that constitute the reasons for legislation or administrative regulations." Mass. G. Evid. § 201 note, at 23 (2017). The demographic data at issue here are adjudicatory facts because they bear on the identification of the defendant as one of the perpetrators of the home invasion, a matter for the jury.

[6] These rights are not waived simply by the defendant's absence, even where that absence is voluntary. See Robinson v. Commonwealth, 445 Mass. 280, 288 (2005) ("The defendant's waiver of the right to be present at the hearing, however, does not imply waiver of other constitutional rights, including the right to the suppression hearing itself and the right to effective assistance of counsel at that hearing").

element of an alleged offense"); <u>Commonwealth</u> v. <u>Kingsbury</u>, 378 Mass. 751, 755 (1979). The identity of the person who committed, or is suspected of committing, a crime is not a matter amenable to judicial notice. Even in situations where judicial notice is appropriate, it should not be taken without notice to the parties and an opportunity to be heard. See Mass. G. Evid. 201(d) and commentary thereto; <u>Department of Revenue</u> v. <u>C.M.J.</u>, 432 Mass. 69, 76 n.15 (2000) (and cases cited) (parties have right to notice of matters court will adjudicate).[7]

There is an independent reason why the judge should not have turned to the demographic data here, regardless of its apparent reliability. The information was not relevant either to (1) determining the moment the defendant was seized in a constitutional sense, or (2) determining whether, at that moment, there was reasonable suspicion to believe the defendant had committed, was committing, or was about to commit a crime. The latter "depends on . . . the facts and circumstances within the officer's knowledge at the time." <u>Dame</u>, 473 Mass. at 536 (quotation omitted). See <u>ibid</u>. (in the context of probable

---

[7] We take this opportunity to stress that judges should use great caution before conducting independent research into factual matters, particularly on the internet. See S.J.C. Rule 3:09, Canon 2.9(C) (2016) ("A judge shall consider only the evidence presented and any adjudicative facts that may properly be judicially noticed, and shall not undertake any independent investigation of the facts in a matter.) See also American Bar Association Formal Opinion 478, Independent Factual Research by Judges Via the Internet (Dec. 8, 2017).

cause); <u>Commonwealth</u> v. <u>Meneus</u>, 476 Mass. 231, 234 (2017) (in the context of reasonable suspicion). Reasonable suspicion cannot rest on later-developed facts not shown to have been known to officers at the relevant time.

For all of these reasons, the judge should not have taken judicial notice of demographic data to support his conclusion that reasonable suspicion existed. We therefore set those findings aside and do not consider them in our independent application of constitutional principles to the remaining facts. For purposes of our analysis, we accept the judge's finding that the defendant merely acquiesced, and did not consent, to the taking and search of his backpack, see <u>Commonwealth</u> v. <u>Greenberg</u>, 34 Mass. App. Ct. 197, 201-202 (1993) ("Whether one who hands his property over to the police at their request voluntarily consents, or merely acquiesces to a claim of lawful authority, presents a question of fact. See Smith, Criminal Practice & Procedure § 252 [1983]"), and therefore assess the existence of reasonable suspicion as of that moment.[8] "That suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a

---

[8] Although the defendant argues that he was seized when Andre parked his cruiser half on the sidewalk in front of the defendant, the point is academic since reasonable suspicion existed at both times. We further note that the defendant makes no argument regarding the search or seizure of the backpack other than that there was no reasonable suspicion at the moment he was stopped.

'hunch.'" Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007), quoting from Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "Reasonable suspicion is measured by an objective standard, . . . and the totality of the facts on which the seizure is based must establish 'an individualized suspicion that the person seized by the police is the perpetrator' of the crime under investigation." Meneus, 476 Mass. at 235, quoting from Warren, 475 Mass. at 534. A general description that fails to "distinguish the suspect from other individuals," Doocey, 56 Mass. App. Ct. at 554, cannot alone support a finding of reasonable suspicion. See Commonwealth v. Cheek, 413 Mass. 492, 497 (1992); Warren, supra at 540.

Were it standing alone, we would agree with the defendant that the description of the suspects in this case (three young black males wearing regular clothes, two with backpacks) was insufficiently particularized to support reasonable suspicion. But "the value of a vague or general description in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under investigation." Meneus, 476 Mass. at 237. Here, it was enhanced by the fact that the defendant was found not far from the location of the crime and under circumstances that made it likely the suspect was still in the area. Where, as here, it is a short distance between the

location of the crime and the location the defendant was stopped, "[p]roximity is accorded greater probative value in the reasonable suspicion calculus." Warren, 475 Mass. at 536. Although it is true that six hours had already elapsed since the commission of the crime, it was a fair inference from Smith's repeated circling of the area (which began shortly after the crime), her disingenuous explanations for her presence, the fact that she had not "yet" picked "him" up, and the fact that she was in cell-phone communication with someone on this subject not long before the defendant was spotted, that the suspect likely remained in the immediate area. See Doocey, 56 Mass. App. Ct. at 556 (likeliness that a defendant will be found in the area where police are searching is relevant to reasonable suspicion calculus). Contrast Warren, supra at 537 (concluding there was no "rational relationship" between the timing and location of a stop where an officer had no reason to be looking for a suspect in the area where the defendant was stopped). Finally, we also take into consideration the "gravity of the crime and the present danger of the circumstances," Meneus, supra at 239 -- here, a serious armed robbery with shots fired. "[T]he fact that the crime under investigation was a shooting, with implications for public safety," added to the reasonable suspicion calculus. Ibid.

For these reasons, we affirm the order denying the defendant's motion to suppress.

<u>So ordered</u>.